*In re* ROSE J. GIBSON, a minor.—(VIRGINIA GIBSON, Respondent-Appellant, *v.* THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee.)

(No. 73-294;

Second District—January 16, 1975.

Jerrold R. Beger, of Schirmer, Schirger, Beger & Graff, of Rockford, for appellant.

Philip G. Reinhard, State's Attorney, of Rockford (Harris H. Agnew, Assistant State's Attorney, James W. Jerz, of Illinois State's Attorneys Association, and Donald L. Schriver, of counsel), for the People.

Mr. JUSTICE RECHENMACHER delivered the opinion of the court:

This is an appeal from the decree of the circuit court of Winnebago County terminating the parental rights of Virginia Gibson, mother of Rose Gibson, a minor. The decree is based on a finding by the court that Virginia Gibson is an unfit person in that she failed to maintain a reasonable degree of interest, concern or responsibility for the welfare of Rose Gibson, her daughter. (A default decree was also entered against the father, Roger Gibson, whose whereabouts are unknown. There is no appeal as to the decree against him.) There was conflicting testimony at the hearing to terminate parental rights, but we believe that the record establishes the following facts. Rose Gibson was born on May 6, 1963. In November 1965, when she was approximately 2½ years old, a dependency decree was entered against her parents, Virginia and Roger Gibson, finding that Rose was a neglected child and the parents were unfit and improper guardians of the child and appointing the county probation officer, Goldie Floberg, as her guardian. However, the decree entered at that time did not terminate parental rights and did not give the guardian power to consent to the child's adoption. It should be noted that at that time the failure to maintain a reasonable degree of interest, concern or responsibility for the child's welfare was not a ground for finding of "unfit person."

Rose was accordingly placed in Children's Convalescent Home in Rockford (later referred to as Floberg Center after its removal to Rockton) as a dependent child. She was placed in a foster home shortly thereafter and later, in 1966, was placed with her aunt and uncle, Mr. and Mrs. Peavey, in Rockford, and subsequently with a maternal aunt, Mrs. Jackson, but in August of 1966 she was returned to the home. On January 28, 1967, a petition for an amended decree was filed seeking to declare Virginia Gibson and Roger Gibson unfit parents, alleging they are deserted and abandoned their child and asking that Goldie Floberg, as guardian, be empowered to consent to the adoption. This petition was never pursued. In 1972 she was also placed in a foster home in Milwaukee, Wisconsin, but that was only for 4 days. Other than the times mentioned Rose has been in the Children's Convalescent Home or its successor, the Floberg Center, since the dependency decree of November 1965.

Rose is a physically attractive child. She has a "learning disability," is of low average mentality, and at the time of the hearing in 1972 she was repeating third grade, but was doing well.

Virginia Gibson, the respondent, had only a sixth-grade education. She has no skills and no regular employment and no home of her own but lives with her mother. She earns some money at baby sitting. Her testimony indicates her to be a person of limited capabilities.

In April 1972, apparently on the basis of inadequate visitation by the respondent, a supplemental petition was filed to terminate the rights of the parents and give the guardian power to consent to Rose's adoption. The supplemental petition alleges that the respondent is an unfit person in that she failed to maintain a reasonable degree of interest, concern or responsibility for the child's welfare.

At the hearing the principal witness for the State was Patricia Gould, a psychologist who was during 1968 to 1972 the director of the Floberg Center. She testified that during this period she had only noted seven visits by Virginia to the child, being about six visits from 1968 to 1970, and in the period between the time the Convalescent Home was moved to Rockton, in October 1970 and the filing of the petition in April 1972, Virginia visited her child, Rose, only once. However, after 1972, the time of the filing of the petition to terminate the parental rights, the visits increased "dramatically," being almost every week, and Virginia did show a reasonable degree of concern and interest for Rose's welfare after April of 1972.

Virginia Gibson testified that she visited Rose "all the time" when she was at the Home in Rockford; that she did not remember when the Home moved to Rockton, but that she visited Rose at Rockton whenever she could get a ride. She also testified she had written her several letters during 1971 and 1972. She testified she did not give presents to Rose at Christmas while the Home was located on Tenth Street in Rockford because "they didn't want me to" but that she did give Rose presents at Christmas after the move to Rockton.

Artis Peavey, Virginia's mother, testified that Virginia visited Rose "as much as she possibly could"; that after the move to Rockton there were times when transportation difficulties prevented Virginia from visiting her because it was 10 miles from her home and she had no car, and she therefore did not visit her every Sunday.

The trial judge on the basis of the testimony found that Virginia had not maintained a reasonable degree of interest, concern or responsibility toward the welfare of the child and was therefore an unfit person. Her parental rights were therefore ordered terminated, and the county probation officer, Goldie Floberg, given authority to consent to her adoption.

A finding that a parent is an "unfit person" requires more than a preponderance of the evidence. In *In re Overton* (1974), 21 Ill.App.3d 1014, Justice Guild, speaking for this court, held that the judgment of the trial court should be reversed because the finding by the trial court that the mother had failed to maintain a reasonable degree of interest, concern and responsibility for her children's welfare was not based on clear and convincing evidence. In previous cases the same degree of proof has been required for a finding of unfitness (*In re Adoption of Walpole* (1955), 5 Ill.App.2d 362; *Carlson v. Oberling* (1966), 73 Ill.App.2d 412), and while the earlier cases were decided prior to the amendment to the Adoption Act (Ill. Rev. Stat. 1967, ch. 4, par. 9.1—1D(b)) creating the category of unfitness based on failure to maintain a reasonable degree of interest or concern for the welfare of the child and dealt with desertion or abandonment, the basis of the finding was that of unfitness and the degree of proof should not be less under the newer wording. We are of the opinion, therefore, that clear and convincing evidence must be shown in the present case before finding the respondent mother an unfit person.

The respondent urges that clear and convincing evidence sufficient to justify the drastic action of terminating the natural rights between mother and child was not offered in this case. It is true that only one witness was clear and definite in her testimony as to Virginia's dereliction. That was Mrs. Gould, who testified that actual records were kept of visits, and her testimony as to the number of visits by Virginia were based on those records. The respondent and her mother both offered contrary testimony. If the testimony of the State's witnesses is to be believed, the visitation was sparse indeed from 1965 to 1970, and there was a complete drought in 1971, with no recorded visits—the first visit after the removal of the Center to Rockton in October of 1970 having been the suggested visit which occurred in January of 1972. Unless this neglect was excusable due to transportation problems, it provided a rational basis for the court's finding of unfitness due to failure to maintain a reasonable degree of interest, concern or responsibility for the child's welfare. However, Mrs. Gould admitted that part of the reason for the infrequent visits was a transportation problem of the mother. It is also to be noted that after Judge Layng's order of August 9, 1972, was entered to assist Virginia Gibson with transportation, her visits dramatically increased.

■■■ The State cites seven cases in support of the petition to terminate respondent's parental rights on the ground of unfitness. However, only two of these held that the rights of the natural parents should be extinguished—the others all held in favor of the natural parent. One of the two, *Campbell v. Fisher* (2nd Dist. 1961), 28 Ill.App.2d 454, is clearly

inapplicable, because while this was a decision of this court it was, as stated by the court, based on what the court considered to be the best interests of the child, without regard to any finding of unfitness, whereas under the present wording of the Adoption Act (Ill. Rev. Stat. 1971, ch. 4, par. 9.1—8) the finding that a natural parent is an "unfit person" is mandatory for an adoption without the parents' consent. The other case, a First District case, *In re Perez* (1973), 14 Ill.App.3d 1019, is clearly distinguishable in its facts. There the mother left the child in the hospital after its birth and did not inquire about it, send a gift or letter or visit the child after the first month, for some 5 years. During these years the child was in the home of its proposed adoptive parents. While the mother testified she left the child in the hospital because she feared her husband would harm it, there was no explanation for her failure to keep in touch with the child during the 5 years when it was being taken care of by its foster parents. This extreme situation of neglect, plus the immediate prospect of adoption of the child, makes this case clearly distinguishable from the one presently before us, as well as from *In re Moriarity* (1973), 14 Ill.App.3d 553, and *In re Overton*, both decisions of this court, and the First District case of *In re Smith* (1972), 4 Ill.App.3d 261; the Third District case of *In re Cech* (1972), 8 Ill.App.3d 642, and *In re Walpole*, and the Fourth District case of *In re Deerwester* (1971), 131 Ill.App.2d 952, all (except *In re Overton*) cited by the State in its brief, but all of which held in favor of the natural parent. It is evident that under the recent decisions interpreting that section of the Adoption Act dealing with adoption without the natural parents' consent (Ill. Rev. Stat. 1971, ch. 4, par. 9.1—8) a finding of "unfit person" is mandatory, and it must be found by clear and convincing evidence. (See *In re Moriarity* and cases cited.) This, as the results of the cases suggest, is a standard of proof not to be taken lightly.

The respondent urges on the basis of this court's previous recent decisions in similar cases, that is *In re Moriarity* and *In re Overton*, that the proof in this case is insufficient to establish the mother's unfitness.

In *Moriarity* the mother's conduct was far from exemplary and her background was stated by the State's Attorney as showing a "history of criminal problems and arrests." But on the narrow ground that she never exhibited any intention to abandon her children, as set forth in the State's petition, this court held she was not an "unfit person" within the meaning of the Adoption Act, and the trial court's decree terminating her parental rights was reversed. It is true that the legal issue was different from that in the case before us in that *abandonment* of the children was alleged rather than mere failure to maintain a reasonable degree of interest and concern for them, but the larger issue of parental rights versus

social needs was the same. Nevertheless, the court refused to terminate the mother's rights as natural parent, saying that although the State's efforts to look after the best interests of its wards was laudable its efficiency had had an unjust result in that case.

*Overton* is similar to the present case. There, too, the mother was neglectful of her children after they were made wards of the State. While the period of neglect was not as long before the filing of the supplemental petition, this may have been merely because it was not as long between the initial commitment of the children to the Department and the filing of the supplemental petition to terminate the mother's parental rights. In some respects the mother's behavior was more dubious in the *Overton* case, as can be seen from the opinion. Yet, this court held that due to the exigent circumstances which occurred and the pressures which operated upon her during the period between the time of the initial dependency petition and the filing of the petition alleging her unfitness—a period of some 20 months—she should not be found to be an unfit person and subject to termination of her parental rights. It should be noted that in this case, as in *Moriarity,* the issue of what was best for the children was not given consideration, since the finding of unfitness—a condition precedent to other considerations—was not upheld.

This case and the *Overton* case are not morally distinguishable. Virginia Gibson, too, is under handicap which would mitigate her neglectful conduct. She has only a sixth-grade education, and although this does not in itself excuse her it might suggest, as did her testimony, that she was not fully aware of her responsibilities after the child was made a ward of the State or the consequences of her alleged neglect. The testimony at the hearing indicates that her counselors at the Center were not very helpful in this regard. Her lack of any kind of gainful employment except baby sitting, at the age of 32, suggests a very limited person without initiative and lacking in perspective. The trial court made an actual finding that Virginia had never petitioned the court for the return of custody of the child; yet, the testimony indicated that Virginia had neither a home of her own nor any resources to enable her to support the child herself, and it is not to be taken for granted—rather the contrary—that the child could be established in the grandmother's home. Older people love their grandchildren but they normally do not want to take responsibility for them. We cannot say that Virginia should have taken the child back to her mother's home. She may have been all too aware, consciously or unconsciously, that a decent respect for the child's welfare dictated her remaining at the Center rather than in Virginia's own inadequate care.

While the effect of the removal of the Center to Rockton and the con-

sequent transportation difficulties is a matter of some dispute, it seems logical to suppose that it was a formidable obstacle to a person without transportation of her own and dependent on friends or relatives to drive her to Rockton on a Sunday afternoon and remain during her visit with the child. Upon the filing of the supplemental petition and transportation being arranged for by the court, the visitations under the court's order increased, as Mrs. Gould said, "dramatically." We can speculate that the increased interest by Virginia was only the result of the State's action to terminate her parental rights and will disappear if the decree is reversed, but on the other hand, it is possible that having been jolted into an awareness of her callous and irresponsible behavior by the threatened loss of her child, she may have reformed her attitude toward the child permanently. At the hearing Mrs. Gould testified that at that time—late 1972—Virginia was showing a reasonable interest, concern and responsibility for the welfare of her child.

■■ In *Overton*, in spite of the derelictions of the mother, which were considerable, we found, upon giving consideration to all the surrounding facts and circumstances, that there was no clear and convincing evidence of her unfitness. The circumstances alluded to in the present case are passive rather than active in affecting the mother's failure to show reasonable parental concern and responsibility, but in the light of such circumstances plus the change in attitude which, for whatever reason, occurred subsequently, we are inclined to follow the *Overton* case in the present decision.

One more point should be given some brief comment. There was a suggestion both in the testimony at the hearing and the oral argument that it was in the "best interests of the child" that her mother's parental rights be terminated so as to facilitate Rose's adoption. But, the best interests of the child are not always as readily discernible as we blithely assume. We, too, are interested in what is best for Rose Gibson, but does the breaking of her natural and legal ties to her mother necessarily accomplish something to her benefit? Rose is going on 12 years old. She has at least a learning disability as a result of which she would not be placed for adoption with people who wanted to send their child to college. Her age, plus her disability—a serious one since nearly everyone wants at least the possibility of educating their child for college—considerably reduces the chances for adoption. If as a result of her mother's renewed interest following the filing of the petition for termination, she has grown closer to her mother, this will further erode her chances for successful and happy adoption. Due to these negative factors, can we be sure enough of her prospect of adoption to assume the responsibility of completely and utterly wiping out the relationship with

her mother. For this is what it would mean. She cannot be sure of adoption under the circumstances—she can only be sure of losing her mother.

This is a fact we do not care to balance against the uncertain prospects of the child's adoption in order to satisfy a feeling that we are acting in the best interests of the child.

The decree of the circuit court of Winnebago County is therefore reversed.

Judgment reversed.

GUILD and SEIDENFELD, JJ., concur.