Brigitte Lehmann (mother) and her present husband, Karl Heinz Lehmann, filed a petition for adoption of Kristine Vienup, the minor child of the mother and Nick Shapkoff (respondent). The petition alleged that the respondent was an unfit parent in that he had abandoned and deserted the child for a period in excess of three months and had failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. Ill. Rev. Stat. 1973, ch. 4, par. 9.1-1D(a), (b) and (c).
Respondent filed a petition in the nature of an answer to the petition for adoption. He alleged that he was the father of the child, as adjudicated in the municipal division of the circuit court. He made various other allegations which in effect denied the charges in the original petition. He alleged that the mother had arbitrarily refused to permit his visitation with the child. Petitioners filed an answer to the pleading of respondent which was in the nature of a reply thereto. In effect this pleading denied the allegations made by the respondent and alleged that the respondent had no interest in the child but was actually attempting to retain contact with the mother.
After a hearing the circuit court entered a decree granting the prayer of the petitioners for the adoption of the minor. The decree found that the respondent "is an unfit person in that he has abandoned and deserted said child for a period in excess of three months prior to the filing of the adoption petition herein; and that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." The respondent has appealed. A statement of the evidence is essential.
The case is remarkable for the depth and extent of the bitterness and antagonism between the mother and the respondent as well as for the contradictions in the testimony of both sides of the controversy. Neither *Page 219 
the mother nor the respondent gave a residence address in open court for the stated reason that each feared to give this information to the other.
At the start of the relationship between these parties, the mother lived in a family building occupied by her mother, her brother and the latter's wife. At that time, the mother had another child named Marion Vienup. This child was born as a result of a marriage which ended in divorce. The child here involved, Kristine, was born on December 30, 1969. At that time, the respondent occupied a basement flat in the building in which the mother lived. For some time the mother had lived in the top apartment of the house.
The mother testified that she was in the hospital for seven days when the child was born. Respondent came there to visit her only once or perhaps "on a couple occasions" during that period. The expense for the hospital and the doctor's services was close to $2000. She testified that the respondent gave her $500 toward these expenses; she received $300 from her sister-in-law and the doctor bills remained unpaid. The mother testified that from the birth of the child, for approximately one year, respondent gave her no money for support of the child. Respondent paid Emma Jablonski $25 a week for rent for his apartment. Also, he went grocery shopping with the mother every week and purchased and paid for the groceries. She testified that respondent left the basement apartment about six months after the child was born. There was a rift or disagreement between them commencing at the time the child was born.
In December of 1970, pursuant to paternity proceedings instituted by the mother, the respondent admitted his parentage of the child. The court then entered an order requiring respondent to pay child support. The proceedings in the municipal division do not all appear in this record but the parties are partly agreed regarding action taken by that tribunal. The mother testified that she had never lived in the basement apartment with the respondent although sometimes she had cooked meals for him. On November 11, 1972, the mother married Karl Heinz Lehmann. They live now in a five-room apartment with Marion, the child of a former marriage, and with Kristine, the minor here involved.
The mother testified, without objection, that the respondent never showed any interest in the child "from the day she was born." She also stated that the respondent "never paid any attention" to the child even when he came with the ostensible purpose of visiting the child. She testified that on these occasions respondent would take only one look at the child and when he visited her in the hospital he did not see the child.
The principal contradiction between the parties arose from their description of the contacts between them after the respondent had vacated the premises in which the mother's family lived. The mother testified that respondent had no interest in the child and that he made a pretense of *Page 220 
visiting the child only for the purpose of maintaining contact with her to reestablish a relationship between them. She conceded that the respondent had gone before the municipal division to obtain rights of visitation and that he had on a number of occasions come to the home of her family.
However, it is her version that these visits were not motivated by a sincere desire to visit the child and that each such visit ended with an altercation, sometimes physical, between her and the respondent. On occasion she called the police but could not have respondent arrested because she did not know where he lived. He assaulted her several times and at least once pulled her hair so forcibly as to cause bleeding. On two visits he broke down a door at the home. She testified that she behaved throughout these visits and that she did permit him to see the child but that he had no feeling for the child but came to see her. She conceded in her testimony that she did not permit him to see the child until so directed by the court.
As regards support of the child, the mother testified that she had retained possession of certain checks that had been sent to her by the respondent for child support since her marriage to Karl Lehmann. These checks were all sent to her from the court. In response to questioning by the trial court, the mother was unable to state the total number of payments or the exact amount received but she stated that it could have been 10 payments. It is conceded by all parties that at one stage of the proceedings in the municipal division, the respondent was found guilty of contempt for wilful failure to comply with the order for child support and was jailed for 17 days. The court ordered support payments of $25 per week later reduced to $15. The respondent owed an arrearage of $1000.
Emma Jablonski, mother of Brigitte Lehmann, testified that the respondent made payments of his own rental for his basement apartment to her. Her daughter did not live in that apartment. She was present at one altercation between her daughter and respondent. She testified that her daughter was holding on tight to a door and that "he wanted to throw her stairs down." She also saw the respondent pull her daughter's hair and she saw pieces of hair on the stairs. This caused a bald spot on her daughter's head.
Edith Jablonski is a sister-in-law of Brigitte Lehmann. She lived in the family building. At the time the baby was born, the mother was living with the witness and the latter's husband on the top floor of the building. Respondent then occupied the basement flat. He lived there by himself. The mother lived with the witness when she returned from the hospital. This witness was present on some of the occasions when the respondent came to visit the child. He came "quite often" and there were always problems.
She described the incident at which the respondent pulled hair out of *Page 221 
the mother's head; although at the time the mother gave him no provocation. She testified that the respondent dragged the mother out to the porch on the second floor and "was trying to throw her down the porch." She also testified that on another occasion the respondent came to her back door. She locked the screen door and the window and told him to leave. He responded by tearing off the screen door halfway to the bottom and throwing this portion down into the backyard. She was present at yet another incident in which respondent pulled the mother's hair and then ran out of the front door. The police were called on each of these occasions. This witness expressed the opinion that the mother had cared for the minor child in a proper manner as regards food, clothing and medical attention.
Karl Heinz Lehmann, present husband of the mother and one of the petitioners for adoption, testified that he came to this country some five years ago when he was 24 years old. He has worked for International Harvester Company for a year and prior to that time was a janitor in a high school. He saw the respondent "a couple times sneaking around the house" and told him to leave. He freely admitted the existence of animosity between his wife and the respondent. He testified, without objection, that respondent did not wish to see the child but that, "He wants to see my wife."
The respondent testified that he was born in Bulgaria and came to America in 1962. He lived in the basement apartment and continued to reside there for about one year after the child was born. He testified that the mother did not live in his apartment but lived in another portion of the house. He also testified that he paid $25 a week to Emma Jablonski, always in cash, "for both of us." Respondent testified that the mother had refused to marry him. After the birth of the baby, he gave her $1500, "and she spent it foolishly." He had freely acknowledged at all times that he was the father of the child.
He testified that he came to the family building only to see the child and that he expressly told the mother that he wanted nothing to do with her. He conceded that there were "problems" every time he went to see the child but stated that this had been caused by Karl Lehmann. He denied that he had pulled the mother's hair and accused her of pointing a gun at him. He conceded that there had been an incident involving the screen door but testified that he did not break the door but that it fell apart because it was old. He did, however, offer Edith Jablonski $20 to pay for damage to the door. He also testified that once the mother sent the police to his place of employment and that this caused him to lose his job.
As regards child support, he testified that he had made a few payments and would make up those he missed. He denied categorically that he had ever abandoned the child. He testified that if he would buy toys for the *Page 222 
child, or send her a card, these things would be put in the garbage. He conceded that he did not ever see any toys that he had sent the child in the garbage but stated, "They told me they didn't want nothing from me."
A person who had known the respondent for 32 years since they were children testified that he had never met the mother. However, he had seen the respondent with the child in the summer of 1970 or 1971. At that time the respondent exhibited the child to him. On cross-examination he testified that he thought the child had been brought there by the respondent without the knowledge of the mother. This witness labored under a language difficulty which was presented in varying degrees by the testimony of all who testified.
On rebuttal, the mother denied that either she or her sister-in-law had threatened the respondent or exhibited a gun to him. She specifically denied that respondent had given her $1500 and stated that she had only received $500 which had been paid toward the hospital bill. The $1500 amount also appears in the record as being $1300.
• 1 There are a number of basic legal principles which must be applied to the facts above stated. We have previously had occasion to express these matters in In re Grant, 29 Ill. App.3d 731,735, 736, 331 N.E.2d 219. We are obliged first to recognize the inherent right which all parents have to the society and custody of their own children. This right should not be abrogated without compelling reasons. (In re Gonzales,25 Ill. App.3d 136, 143, 323 N.E.2d 42.) To justify termination of the rights of natural parents, their unfitness must be established by clear and convincing evidence as distinguished from a simple preponderance. (In re Moriarity, 14 Ill. App.3d 553,556, 302 N.E.2d 491; In re Perez, 14 Ill. App.3d 1019,1020, 304 N.E.2d 109.) The pertinent statute is explicit and strong in making the best interests and welfare of the child "of paramount consideration in the construction and interpretation of this Act." (Ill. Rev. Stat. 1973, ch. 4, par. 9.1-20a.) However, this statutory "declaration does not mean that, absent consent or unfitness, an adoption can be granted solely upon the basis of the best interest of the child." In re Adoption of Cech, 8 Ill. App.3d 642,645, 291 N.E.2d 21.
In the case before us, the record discloses diametric contradictions in portions of the testimony. The respondent paints a picture of a loving parent who is being wilfully deprived of his inherent right to society of his child. Quite to the contrary, the mother and her present husband, together with other members of their immediate family, show that the respondent has deserted the child and has failed to maintain a reasonable degree of interest, concern or responsibility as to its welfare and that his violent intrusions upon the mother and her family have been motivated solely by a desire to reestablish a relationship with the mother.
• 2 We have read and considered all of the testimony and have come *Page 223 
to the conclusion that the judgment appealed from should be affirmed. In this regard, we distinguish between abandonment and desertion. This task is made considerably easier by the opinion of this court in, In re Adoption of Cech, 8 Ill. App.3d 642,644, 291 N.E.2d 21, where the difference is clearly and succinctly stated.
 "Abandonment is conduct on the part of a parent which demonstrates a settled purpose to forego all paternal duties and to relinquish all parental claims to the child. Desertion, as contemplated by the Adoption Act, is any conduct on the part of a parent which indicates an intention to permanently terminate custody over the child but not to relinquish all parental duties and claims to the child. (Petition of Smith (1972), 4 Ill. App.3d 261, 280 N.E.2d 770; Thorpe v. Thorpe (1964), 48 Ill. App.2d 455, 198 N.E.2d 743.)"
Considering this distinction, we do not agree with the finding in the decree appealed from that the respondent has abandoned the child. This record does not show by clear and convincing evidence any intention on his part to relinquish all parental claims for the child. His very participation in these proceedings would appear to negate this conclusion. However, in our opinion, the evidence shows in a most clear and convincing manner the intention of respondent permanently to terminate his custody over the child precisely as required in the above noted definition of "desertion." In our opinion, the finding of unfitness, in exact compliance with the statutory requirement of desertion "for more than 3 months next preceding the commencement" of these proceedings for adoption, is proved by clear and convincing evidence.
Actually the only issue presented by this record is the weight and sufficiency of the evidence to support the result reached by the trial court. The trial court here saw and heard all of these parties testify. This is a factor of great importance in every case, particularly where, as here, a lack of facility in the use of English by the witnesses might well lead to difficulty in communication and thus to the possibility of errors in the record as presented. In such a situation the original trier of fact indeed has a strong advantage over the reviewing court. (See Inre Gonzales, 25 Ill. App.3d 136, 144, 323 N.E.2d 42, and cases there cited.) Also, the record reflects that the testimony of respondent serves in at least one instance to corroborate the theory of petitioners. Respondent himself denied that he had intentionally damaged the screen door. He stated that the door "fell apart" because it was old and he offered $20 to compensate for this. The testimony adduced by the petitioners is far stronger and convincing in this and other material instances.
• 3 In addition, the interests and welfare of the child should also receive most careful consideration. We are thoroughly convinced that the best interests and welfare of this minor child will be served by affirmance *Page 224 
of the decree for adoption. To do otherwise would impinge upon the security of the child in the only home she has ever known and would place her in a most difficult situation of complete insecurity. The operation of this factor together with the clear and convincing evidence presented require us to affirm the judgment.
Judgment affirmed.
BURKE, J., concurs.