In In re Grant (1975), 29 Ill. App.3d 731, 735,331 N.E.2d 219, this court noted that adoption which severs permanently not only custodial rights but all rights and duties flowing from parenthood must be subject to the most careful scrutiny. We were reminded in that opinion:
 "This court must recognize the inherent right which all parents have to the society and custody of their own child. * * * This inherent right should not be abrogated without compelling reasons. The courts of Illinois have unanimously held that to justify termination of the rights of natural parents to the custody of their own children, their unfitness for the exercise of their parental rights must be established by clear and convincing evidence."
Other decisions also adopt the requirement of clear and convincing evidence before a result which forever terminates the rights and duties of a natural parent will receive judicial approval. See In re Jones (1975), 34 Ill. App.3d 603,340 N.E.2d 269; Culkin v. Culkin (1975), 30 Ill. App.3d 1073,333 N.E.2d 698; Kubisz v. Johnson (1975), 29 Ill. App.3d 381, 385,329 N.E.2d 815; In re Gibson (1975), 24 Ill. App.3d 981, 984,322 N.E.2d 223; In re Adoption of Shuman (1974), 22 Ill. App.3d 151,319 N.E.2d 287; In re Overton (1974), 21 Ill. App.3d 1014,1018, 316 N.E.2d 201; In re Moriarity (1973), 14 Ill. App.3d 553,556, 302 N.E.2d 491; In re Adoption of Cech (1972), 8 Ill. App.3d 642,291 N.E.2d 21.
In In re Gibson, it was pointed out that clear and convincing evidence is not a standard of proof to be taken lightly. (24 Ill. App.3d 981, 985.) In In re Jones (1975),34 Ill. App.3d 603, 607, clear and convincing evidence was defined as "proof which should leave no reasonable doubt in the mind of the trier of the facts concerning the truth of the matter in issue." See also In re Estate of Weaver (1966),75 Ill. App.2d 227, 229, 220 N.E.2d 321.
This court has not been favored with specific findings by the trial court referring to such evidence except for the following finding in the decree:
 "7. That the father of the said child, Nick Shapkoff, is an unfit person in that he has abandoned and deserted said child for a period in *Page 225 
excess of three months prior to the filing of the adoption petition herein; and that he has failed to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare."
I do not find in the record clear and convincing evidence of either desertion or failure to maintain the degree of interest, concern or responsibility required by the statute. Ill. Rev. Stat. 1973, ch. 4, § 9.1-1 D(b) and (c).
The respondent lived in the same building as the mother and the child for a period of time after the child's birth. The mother and the respondent disagree as to whether this was a period of 6 months or a year, the respondent contending that it was the longer period. The respondent did not contest the paternity proceeding instituted by the mother; on the contrary, he acknowledged that he was the father. He partially complied with a court order requiring that he support the child, but fell in arrears at times he claimed that he was unemployed. The mother does not dispute that the respondent was at times unemployed. There is also undisputed evidence that the respondent wished to marry the mother, but she rejected his proposal of marriage. This proposal and rejection came when the mother learned she was pregnant. At the time of the paternity hearing, the respondent was still suggesting marriage, but the mother was still unwilling to marry him.
When the baby was born the respondent wanted to put his surname on the birth certificate but the mother objected to this. The respondent continued to make support payments for the child after this adoption suit was filed. The last time the respondent attempted to see the child was 5 or 6 months before the hearing on the adoption petition. At that time the child was at a neighbor's house. When the respondent appeared, the neighbor said that she had received orders from the mother not to let the respondent see the child, and the respondent then left.
The respondent filed a petition seeking to enforce visitation rights with the child but that petition was never disposed of by the court in which it was filed.
There is no doubt that there is extreme hostility between the mother and the respondent, and this hostility has become more severe with the passage of time and with the mother's marriage to her present husband, Karl Lehmann, who seeks to adopt the child. Most efforts of the respondent to see the child have concluded in fights between the mother and the respondent. The record indicates the likelihood that the hostility arises from the emotions and attitudes of both the mother and the respondent towards each other, and that neither party is blameless. It does not appear, however, that the mother has made any effort to permit the respondent to see the child with someone other than herself present so that the tempers which manifested themselves when the mother and the respondent confronted each other could be avoided. *Page 226 
The following undisputed testimony of Edith Jablonski, the mother's sister-in-law, establishes that the respondent unsuccessfully attempted to see the child outside the presence of the mother:
 "Q: Would you have been willing to bring Kristine out to see Nick?
A: She's not my child.
Q: Were you ever asked to do this?
A: Yes.
Q: By whom?
A: By Nick.
Q: And did you do this?
A: No.
Q: Why not?
A: Because the mother doesn't want it.
 Q: Nick asked you to bring Kristine out to see him, therefore, he wouldn't have been with Brigette [sic] then, would he?
 A: He called on the phone and he asked then. I wouldn't let him see Kristine. She wouldn't have to know. I said no. She's not my child and I cannot do it.
Q: Did you relate this to Brigette [sic]?
A: I told Brigette [sic].
Q: What was her attitude?
A: That I did the right thing."
The mother conceded that after the respondent had behaved violently on some visits, she would not allow the respondent to make arrangements with her mother, Emma Jablonski, or with Edith Jablonski to see the child.
Desertion, as used in the Adoption Act, is conduct by the parent indicating an intention permanently to terminate custody over the child but not to relinquish all parental duties and claims to the child. In considering whether a parent is guilty of desertion, the primary consideration is the parent's intent. The mere fact of physical separation does not necessarily constitute desertion. (In re Overton (1974), 21 Ill. App.3d 1014,316 N.E.2d 201; In re Deerwester (1971), 131 Ill. App.2d 952,267 N.E.2d 505.) The failure of the respondent to challenge the mother's custody of the child does not demonstrate his intent permanently to terminate custody. He never had custody, and it is obvious, as is usually the case, that the child was better off living with the mother than with the respondent. Any effort by the respondent under these circumstances to gain custody over the child would have been futile.
In this case, the physical separation between the respondent and his child was caused by the hostility between the parents rather than by any *Page 227 
intent on the part of the father to desert his child or not to see her or be concerned about her. The only evidence to the contrary, other than the respondent's delinquency in child support payments, is the mother's assertion that the real purpose of the respondent's visits was to re-establish a relationship with her, not to see the child. But, while the respondent may have been motivated by a desire to re-establish a relationship with the mother or even to injure her physically, this does not mean that he was not also motivated by a desire to be with his child, to see her, and to act as a parent toward her. Unless it was impossible for the respondent's desire to see his daughter to have coexisted with his hostility to the mother, the violent encounters between the respondent and the mother do not establish desertion by the respondent.[1] What is crucial is respondent's attitude toward the child, not toward the mother. His attitudes towards the mother do not exclude his desire to be a parent to his daughter.
We need not rely on the credibility of the respondent to conclude that he wanted to act as a parent toward Kristine. Nor is it necessary to rely on the testimony of a friend of the respondent's that in the summer of 1970 or 1971 the respondent accompanied by the child visited him on a beach and proudly stated that the child was his. More impressive is that members of the mother's family, while echoing the mother's claim that the respondent lacked interest in the child, produced evidence to the contrary. Edith Jablonski testified to respondent's unsuccessful attempt to see the child outside the presence of the mother. The mother's present husband testified that he once found respondent hugging Kristine, whereupon he chased the respondent away. Even the mother admitted that the respondent saw the child, if only briefly, on each of his visits. It is significant that at the conclusion of the hearing, several weeks before the decree was entered, the trial judge recommended to the parties that they discuss the possibility of preserving visitation rights of the respondent with the child, and put the case over until both counsel could talk with their clients. This recommendation indicates to me that the trial judge was persuaded that the evidence established the respondent's desire to see his child.
Granting the accuracy of every factual assertion made by the mother and her family, as distinguished from their conclusion that the respondent lacked interest in the child, the evidence still does not establish desertion. I, therefore, do not believe that affirmance can be justified upon the theory that the trial judge had the opportunity to hear the witnesses and observe their demeanor. The only other support for the finding of desertion is that respondent wilfully fell behind in child support payments. In Carlson *Page 228 v. Oberling (1966), 73 Ill. App.2d 412, 218 N.E.2d 820, failure to pay child support for a much longer period than in the present case was held not to constitute desertion.
I do not understand how the future of the child can be permitted to turn on whether the respondent damaged a screen door and paid $20 to compensate for this damage. The fact is that the mother's family obtained a warrant for the respondent's arrest because of damage to the door and dropped the matter when the respondent offered $20. His act in compromising the matter does not establish that the door did not fall apart because of its age, but even conceding the respondent kicked in the door, this does not diminish his interest in his child or establish an intent to terminate custody over the child permanently.
Absent consent or unfitness, an adoption cannot be granted solely because it may be in the best interest of the child. (Inre Jones (1975), 34 Ill. App.3d 603 at 607, 340 N.E.2d 269.) It is not even clear that adoption under the circumstances presented here is in the best interest of the child. That may appear to be the case as a short-term matter. But no judge dealing with the welfare of the child involved in this case is foresighted enough to know how long the marriage between the mother and Mr. Lehmann will continue, what Mr. Lehmann's attitude will be to the child and particularly what his response to the child would be in the event of the mother's death or serious incapacity or if there is a divorce or separation. We have recently had an appeal in this court involving a husband who adopted his wife's children by a former marriage with the consent of their father, only to attempt to repudiate the adoption when difficulties developed between him and the mother and the mother then left him for residence in Colorado. (See In re Adoption of Daly, 36 Ill. App.3d 962,344 N.E.2d 501.) Since the respondent is protesting the adoption and has persistently demonstrated an interest in his daughter, a permanent termination of the relationship should not receive judicial sanction.
[1] The degree of respondent's violence toward the mother in this case should be compared with that in In re Jones (1975),34 Ill. App.3d 603, 340 N.E.2d 269, where the father's murder of the mother was held not to be relevant to the issue of unfitness absent an allegation of depravity. *Page 229