*In re* JASON DRESCHER, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* EILENE DRESCHER, Respondent-Appellant.)

First District (2nd Division)   No. 79-2111

Opinion filed December 22, 1980.

James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Paul P. Biebel, Jr., Deputy State's Attorney, and Robert J. Tonos, Assistant State's Attorney, of counsel), for the People.

Mr. PRESIDING JUSTICE PERLIN delivered the opinion of the court:

Respondent, Eilene Drescher, appeals from an order of the circuit court of Cook County declaring her an unfit parent, terminating her parental rights, and appointing a guardian to consent to the adoption of Jason Drescher, her minor child. William Dana Drescher, Jason's alleged father, also declared an unfit parent in this cause, defaulted and has taken no appeal from this order. We consider whether the evidence presented to the trial court supported its finding that respondent was an unfit parent.

Based upon the foregoing, we affirm.

Jason was born to respondent on July 22, 1974. At the time of Jason's birth, respondent, a graduate of Rosary College, was 26 years of age and had been divorced for approximately two years. Respondent also had an older son, Aaron, who was born on August 13, 1973.

In November 1975, when Jason was one year and four months old, his babysitter requested that respondent have Jason examined by a physician because he appeared to be in "very poor health."[1] After repeated insistence by both the babysitter and her husband, and after the babysitter ultimately threatened to stop caring for respondent's children if she did not have Jason examined, respondent took Jason to Dr. Armando Perez in February 1976.[2] Dr. Perez, a pediatrician who had seen Jason as an infant, ordered that Jason be immediately taken to Children's Memorial Hospital for evaluation because of the seriousness of his condition. On February 13, 1976, respondent's sister took Jason to the hospital where he remained until March 9, 1976. Although Jason was one year and six months old at the time of his admission to the hospital, he weighed only 15 pounds and 2 ounces. He was "malnourished, had a catatonic posture, a distended abdomen, poor skin texture and a frozen watchfulness." Jason could neither walk nor stand up by himself. Jason's condition was diagnosed as nonorganic "failure to thrive." During his stay in the hospital, respondent visited him infrequently, claiming that it was too inconvenient for her to travel from her place of employment in the Loop to Children's Memorial Hospital, a distance of approximately three miles. A report of suspected child abuse was filed by a Dr. Mervis of Children's Memorial Hospital, which led to the institution of these proceedings.

On April 6, 1976, a hearing was held on the petition for adjudication of wardship during which the court found probable cause that Jason was

---

[1] Respondent was employed at that time by the Social Security Administration.

[2] The record does not indicate on what day in February Dr. Perez examined Jason.

neglected and that there was immediate and urgent necessity that he be temporarily removed from respondent's custody and temporarily placed in foster care pending the adjudication of the petition.[3] The matter was continued for trial until June 22, 1976.

At the hearing on June 22, 1976, respondent, represented by privately retained counsel, entered an admission of neglect of Jason.[4] The following facts, upon which the admission of neglect was entered, were stipulated to by the parties: that within a reasonable degree of medical certainty Jason had not been properly fed while in his mother's care and custody; that within a reasonable degree of medical certainty he had suffered emotional deprivation while in her care and custody; that he had exhibited a catatonic posture and lack of personality development not related to malnutrition; that merely normal feeding was provided during his hospitalization; and that during his hospitalization he gained weight rapidly, became more active and better related to other people.

After presentation of written social and clinical evaluation, the court found that respondent was unable to care for, maintain, protect or promote the well-being of Jason for reasons other than financial ones, and that it was in the best interests of the child and the community that he be committed to the Department of Children and Family Services for placement. As a result, Jason has been in the care of foster parents, Mr. and Mrs. Shy, from April 1976 until the present. The court also recommended that respondent receive counseling.

It is undisputed that from August until December 1976 respondent had approximately 10 visits with Jason in her home. Of the 15 counseling sessions scheduled between August and December 1976, respondent failed to attend four.

From December 15, 1976, until February 2, 1977, Ms. Carlton, respondent's caseworker, did not have any contact with respondent. Respondent stated that she had been visiting her parents in southern Illinois but had not so informed her caseworker. However, on January 8, 1977, respondent had a visit with Jason. On February 2, 1977, respondent contacted Ms. Carlton. During their conversation respondent stated that she would soon be hospitalized for surgery but refused to tell Ms. Carlton the name of the hospital. When Ms. Carlton asked respondent what she intended to do concerning Jason, respondent replied that when she was ready she would call.

---

[3] Respondent was represented by privately retained counsel at this hearing.

[4] Respondent repeatedly stated to the court that her admission was voluntary and in no way coerced, that she had repeatedly discussed the admission with her attorney and had had the benefit of his counsel. Respondent further stated that she understood that her admission could result in Jason's removal from her custody for his entire childhood.

On April 5, 1977, Ms. Carlton wrote a letter to respondent.[5] On April 6, 1977, respondent called Ms. Carlton. During their conversation respondent stated that she did not wish to begin counseling until May because of her physical condition. A tentative visit with Jason was scheduled for April 19, 1977, but respondent cancelled the visit. On both April 19, 1977, and May 11, 1977, Ms. Carlton sent a letter to respondent. Respondent called Ms. Carlton on May 11, 1977, and requested to see Jason. Ms. Carlton requested that respondent first make an appointment for a counseling session because the respondent had not seen Jason since January 8, 1977, and because respondent had not seen Ms. Carlton since December 15, 1976. Respondent had counseling sessions on both May 20 and May 27, 1977. Respondent failed, however, to attend her June 1, 1977, counseling appointment. On June 4, 1977, respondent visited with Jason.

On June 2, 1977, respondent's sister informed Ms. Carlton that respondent had given birth to a daughter, Bryn, on February 11, 1977. Respondent had never told Ms. Carlton that she had been pregnant and had given birth.

Ms. Carlton's next contact with respondent was on July 1, 1977. During this conversation, Ms. Carlton informed respondent that she was transferring to another division and gave respondent an appointment for July 21, 1977.

On July 21, 1977, respondent met with Ms. Carlton and Ms. Haimes, the caseworker assigned to replace Ms. Carlton. From July 21, 1977, until October 20, 1977, respondent had several counseling sessions with Ms. Haimes.[6] In August 1977 respondent had a visit with Jason in her home supervised by Ms. Haimes.

In October 1977 respondent terminated her employment with the Social Security Administration at the suggestion of her supervisor. Respondent claims that her health problems resulted in high absenteeism. Except for selling Tupperware for a short period of time, it appears that respondent has been unemployed.

Ms. Haimes had no contact with respondent between October 20, 1977, and February 9, 1978. On November 4, 1977, Ms. Haimes sent a letter to respondent. On November 11, 1977, she went to respondent's home, knocked on the door, called through an open window but received no response. She left a note asking respondent to contact her. On November 14, 1977, Ms. Haimes sent respondent a Western Union Mailgram. Ms. Haimes made another visit to respondent's home which

[5] All correspondence sent to respondent was sent by certified mail. A copy of all correspondence was sent general delivery. Although all correspondence was entered into evidence, it is not part of the record on appeal.

[6] The testimony of Ms. Haimes reveals only that respondent made several visits. The exhibits which list the counseling appointments are not of record on appeal.

was unsuccessful. A neighbor informed Ms. Haimes that respondent had just been there and that her automobile was parked in front of the house. However, respondent did not answer the door.

On December 15, 1977, January 4, 1978, and February 7, 1978, Ms. Haimes wrote letters to respondent.

On February 9, 1978, respondent called Ms. Haimes and requested to see Jason. Respondent stated that she had been staying with her parents in southern Illinois and that she had had some health problems. Because Ms. Haimes had not seen respondent since October 20, 1977, and because respondent had not seen Jason since August 1977, Ms. Haimes requested that respondent make a counseling appointment prior to visitation. When respondent mentioned that it would be too difficult for her to attend a counseling session due to the difficulties in obtaining a babysitter, Ms. Haimes offered to arrange for supervision of the children at the agency. Respondent replied that she did not want to bring the children and that "she didn't want to stand out in the cold and wait for transportation with the children." A tentative counseling appointment was scheduled for February 17, 1978, which respondent subsequently cancelled. Respondent also cancelled an appointment scheduled for March 1, 1978. Respondent thereafter attended four counseling sessions.

On April 17, 1978, respondent had a visit with Jason.[7] Respondent attended her counseling session on April 18, 1978, but cancelled the following two appointments. A counseling session held on May 9, 1978, was also attended by respondent.

On May 16, 1978, during a counseling session with respondent, Ms. Haimes explained to her "the court rulings regarding return of the child to a parent." Ms. Haimes further informed respondent that the "court gave her essentially two years from the point that the State took guardianship to work toward having her son rehabilitated with her." Ms. Haimes further suggested that a written service contract, setting forth the conditions which had to be met before Jason could be returned, be drafted. Respondent commented that prior to Jason's return she would like to achieve financial stability, relocate to a rural community and remarry. Respondent was of the opinion that she could realistically achieve these goals in five years. Ms. Haimes again informed respondent that "the court had only given her two years" and stressed the importance of establishing a relationship with Jason. On May 23, 1978, respondent attended another counseling session with Ms. Haimes.

When respondent failed to attend her May 30, 1978, session, Ms. Haimes attempted to reach her by telephone but was unsuccessful. Ms. Haimes then sent a mailgram cancelling the tentatively scheduled visit of June 4, 1978, because respondent had failed to confirm the visit.

---

[7] This is the only visit respondent had with her son in 1978.

On June 13, 1978, Ms. Haimes sent a letter to respondent. Respondent informed Ms. Haimes on June 15, 1978, that she had missed her recent appointments due to poor health and because she had been visiting her parents. Respondent also complained of "babysitting problems." Ms. Haimes again informed respondent that she could bring the children to the agency with her.

Respondent had a counseling session on June 30, 1978, and July 7, 1978. She did not attend her session scheduled on July 19, 1978. During the remainder of July as well as August, Ms. Haimes was unsuccessful in her attempts to contact respondent.

From July 7, 1978, until the filing of the petition to terminate parental rights on February 14, 1979, Ms. Haimes had no contact with respondent. Respondent explained that she discontinued counseling in July 1978 because she was pregnant with her fourth child and was experiencing difficulties. Respondent also indicated that she had visited her parents in August 1978 and in December 1978.

There is an inherent right which all parents have to the society and custody of their own child, and this right should not be abrogated without compelling reasons. (*In re Grant* (1975), 29 Ill. App. 3d 731, 735, 331 N.E.2d 219.) An adoption permanently severs not only custodial rights, but all rights and interests of the natural parent. (*In re Jones* (1975), 34 Ill. App. 3d 603, 607, 340 N.E.2d 269.) In order for the court to empower a guardian to consent to an adoption without the consent of the natural parent, the natural parent must be found to be an unfit person as defined in section 1(D) of the Adoption Act. (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D); *In re Deerwester* (1971), 131 Ill. App. 2d 952, 954, 267 N.E.2d 505.) It is the settled law of this State that to justify termination of the rights of natural parents, their unfitness for the exercise of their parental rights must be established by clear and convincing evidence. (*In re Edmonds* (1980), 85 Ill. App. 3d 229, 232, 406 N.E.2d 231.) Clear and convincing evidence means proof which should leave no reasonable doubt in the mind of the trier of fact concerning the truth of the matter in issue. (*In re Jones*, 603, 607.) In determining whether parental unfitness was proved by clear and convincing evidence, we are mindful that the trial court's finding should not be disturbed unless it is contrary to the manifest weight of the evidence and that the credibility of the witnesses is a matter we must leave to the trier of fact. (*In re Jones*, at 607-08.) We must also recognize that cases of this type are in effect *sui generis* and each of them must be decided in accordance with the particular facts of each individual and varying situation. *In re Hurley* (1976), 44 Ill. App. 3d 260, 266, 357 N.E.2d 815.

The grounds relied upon by the court in its order declaring respondent to be an unfit parent are those contained in subsections (b), (m) and (n) of section 1(D) of the Adoption Act. Any one of these grounds will

sustain a finding of unfitness. See *In re Einbinder* (1975), 31 Ill. App. 3d 133, 135, 334 N.E.2d 187.

■■ Subsection (b) defines unfitness as the "[f]ailure to maintain a reasonable degree of interest, concern or responsibility as to the child's welfare." The law emphasizes that it is the efforts of the parent to carry out parental responsibilities, rather than their success, which should be considered in determining the correctness of a finding of unfitness. (*In re Woods* (1977), 54 Ill. App. 3d 729, 735, 369 N.E.2d 1356; *In re Taylor* (1975), 30 Ill. App. 3d 906, 909, 334 N.E.2d 194.) This stems from our courts' recognition of certain "existing impediments" which could thwart an interested parent's actual visitation of his or her child. *In re Barber* (1977), 55 Ill. App. 3d 587, 591, 371 N.E.2d 299.

> "Traditionally, these obstacles have been lack of intelligence (*In re Gibson* (2d Dist. 1975), 24 Ill. App. 3d 981, 322 N.E.2d 223), inadequate transportation (*In re Overton* (2d Dist. 1974), 21 Ill. App. 3d 1014, 316 N.E.2d 201), financial limitations (*In re Ybarra* (1st Dist. 1975), 29 Ill. App. 3d 725, 331 N.E.2d 224), imprisonment (*Peyla v. Martin* (5th Dist. 1976), 40 Ill. App. 3d 373, 352 N.E.2d 407), and the misconduct of Department employees (*In re Taylor*)."

Respondent contends that the Department of Children and Family Services (hereinafter referred to as the Department) interfered with and helped create the lack of visitation between her and her son. She argues that the caseworkers "actually discouraged visitation by requiring [her] to attend counselling prior to being allowed a visit." A close reading of the record discloses that on two occasions respondent was requested to see the caseworker prior to a visit with her son. On May 11, 1977, respondent requested to see Jason. Because respondent had not seen Jason since January 8, 1977, Ms. Carlton requested that respondent first attend a counseling session. Subsequently respondent had a visit with Jason on June 4, 1977. On February 9, 1978, respondent contacted Ms. Haimes and requested a visit with Jason. Because Ms. Haimes had not seen respondent since October 20, 1977, and because respondent had not seen Jason since August 1977, Ms. Haimes requested that respondent first attend a counseling session. Respondent cancelled counseling appointments scheduled for February 17, 1978, and March 1, 1978. Subsequently respondent had a visit with Jason on April 17, 1978.

We do not believe that these two instances were a causal factor in the lack of contact between parent and child. There were no affirmative official acts which were intended or which obviously frustrated respondent's attempts to contact her son. The record reflects the numerous efforts on the part of the caseworkers to maintain contact with respondent. Moreover, respondent was granted visitation at her home,[8] and Depart-

---

[8] Visitation was to occur every other week, for a full day on either Saturday or Sunday.

ment personnel were responsible for transporting Jason to and from visitation. Despite these efforts by the Department, respondent visited with her son only three times in 1977 and only once in 1978. In fact, it appears that she made no effort to visit or contact Jason from April 17, 1978, until the filing of the petition to terminate her parental rights on February 14, 1979, a period of 10 months.[9] (See *In re Martin* (1977), 48 Ill. App. 3d 341, 345, 363 N.E.2d 29.) The present case is not one where the Department prevented parental visitation and then alleged unfitness based upon the same lack of visitation. Rather than cooperating with the caseworkers, respondent appeared to be hiding from them, appearing periodically to make requests. See *People ex rel. Patterson v. Patterson* (1976), 36 Ill. App. 3d 484, 487, 344 N.E.2d 226.

■■ In addition to arguing that the Department discouraged visitation, respondent also claims that the caseworkers failed to advise her of her rights and obligations under the Adoption Act and that such a failure to explain the need to maintain consistent contact with the child resulted in her failure to maintain contact with him. On May 16, 1978, during a counseling session with respondent Ms. Haimes explained to respondent "the court rulings regarding the return of the child to the parent," and stressed to respondent the importance of establishing a relationship with Jason. However, respondent did not visit with Jason between May 16, 1978, and the filing of the petition to terminate her parental rights on February 14, 1979. In addition, it appears from the record that respondent never sent Jason a birthday card or Christmas card, nor inquired about his well-being during the intervals between her visits with him. Thus we do not believe that respondent's failure to maintain a reasonable amount of contact with Jason over the length of time involved in this case resulted from the Department's failure to warn her of the consequences of her inaction. Unlike the parent in *In re Gibson* (1975), 24 Ill. App. 3d 981, 322 N.E.2d 223, respondent is not hindered by an intellectual handicap which would mitigate her lack of concern and responsibility.

In addition, we note that not once during the three years subsequent to Jason's removal from respondent's custody did respondent make a request to the Department of Children and Family Services for the return of the child.

In the cause now under consideration we do not find evidence of any of the above mentioned traditional impediments or any reason which would adequately excuse what appears to be a lack of concern, interest and responsibility on the part of respondent. Rather, the parental unfitness alleged and supported by the record demonstrates that it resulted

---

[9] The record fails to indicate with clarity whether respondent made any efforts to visit Jason subsequent to the filing of the petition.

from respondent's voluntary refusal to show a reasonable degree of concern and responsibility toward her son.

Respondent was also found unfit pursuant to subsection (m) which defines unfitness as "[f]ailure to make reasonable efforts to correct the conditions which were the basis for the removal of the child from his parents or to make reasonable progress toward the return of the child to his parents within 12 months after an adjudication of neglected minor under Section 2—4 or dependent minor under Section 2—5 of the Juvenile Court Act." (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D)(m).) The language of subsection (m) indicates that the two standards set forth in subsection (m) are disjunctive so that failure to make either reasonable efforts or reasonable progress constitutes a ground for unfitness. *In re Edmonds* (1980), 85 Ill. App. 3d 229, 233, 406 N.E.2d 231; *In re Bennett* (1980), 80 Ill. App. 3d 207, 210, 399 N.E.2d 735; *In re Austin* (1978), 61 Ill. App. 3d 344, 349, 378 N.E.2d 538.

It is argued by respondent that the progress which she made was reasonable because she was hindered by misdirected counseling, poor health and work-related problems. In response we note that "in determining whether 'progress' is reasonable, it is necessary first to determine whether any progress whatever has been made. It would be a distortion of the plain meaning of that word to find that there had been 'reasonable progress' where no progress at all had been made." *In re Austin* (1978), 61 Ill. App. 3d 344, 350, 378 N.E.2d 538.

■■ Analysis of the evidence shows strong testimony by the two Department caseworkers that no progress had been made in correcting the conditions which originally led to the removal of her son from her custody in 1976. Respondent has not attempted to contradict this by testimony regarding her efforts in attempting to establish herself and to demonstrate progress.[10] Instead, respondent has sought to demonstrate that she was hindered by "misdirected counseling, poor health and work-related problems."

Respondent claims that her counseling was misdirected and unproductive because the caseworkers, "both of whom had no experience or education in the area of counseling mothers of failure to thrive children, did not attempt to instruct or advise [respondent] on how to cope with a child of such extraordinary needs." We are of the opinion that such counseling cannot be said to have prevented all progress. More frequent visitation, as Ms. Haimes suggested, would have been cognizable progress, "misdirected counseling" notwithstanding. Even after Ms. Haimes on May 16, 1978, stressed the importance of establishing a relationship with Jason, respondent still did not visit Jason.

---

[10] Although respondent argues that she attended numerous counseling sessions, she does not argue that she has demonstrated that any progress has been made.

In addition, we note the absence of any medical testimony substantiating respondent's claims of poor health. On at least one occasion when respondent complained of poor health to the caseworker, the caseworker suggested that respondent see a doctor.

The record further reflects that respondent terminated her employment with the Social Security Administration in October 1977. Respondent sold Tupperware for a short time thereafter. No further evidence of respondent's employment or progress toward her goal of financial stability is of record.

■■ We therefore conclude that the failure of respondent to make reasonable progress toward the return of her child coupled with her failure to maintain a reasonable degree of interest in her child are sufficient to constitute "unfitness" as defined under the respective sections of the Adoption Act.

For the reasons stated we affirm the judgment of the circuit court of Cook County.

Affirmed.

STAMOS and HARTMAN, JJ., concur.