*In re* DESMOND BARBER, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellant, *v.* MATTIE BARBER, Respondent-Appellee.)

First District (2nd Division)   No. 76-253

Opinion filed December 13, 1977.

Robert J. Dudley, of Illinois Department of Children and Family Services, of Chicago, for the People.

James J. Doherty, Public Defender, of Chicago (Frances Sowa and Marc Fogelberg, Assistant Public Defenders, of counsel), for appellee.

Mr. JUSTICE PUSATERI delivered the opinion of the court:

The Department of Children and Family Services (Department) filed a supplemental petition requesting that the parents of Desmond Barber be found unfit under the provisions of the Adoption Act (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—1D(b)) and that a guardian be appointed with the power to consent to his adoption (Ill. Rev. Stat. 1975, ch. 37, par. 705—9). After the hearing, the trial court denied the supplemental petition. The Department appeals from this order raising the following issues: (1) whether the trial court erroneously denied the Department's supplemental petition for the termination of parental rights; (2) whether the determination of parental unfitness encompasses a finding of the best interests of the child.

Desmond Barber was born on June 7, 1963, and was placed in a foster home three days later pursuant to a dependency proceeding. His mother, Mattie Lee Barber, had been placed in a foster home at the age of 13 and had in fact given birth to Desmond when she was 19 and still residing in her foster home. Desmond was placed in the home of his present foster mother Mrs. Gloria Watson in October, 1963, when he was almost four months old, and was still living there at the time of the hearing. Desmond was 12 years old at the time of this hearing.

There is conflicting testimony regarding the number of contacts Mattie Barber had with Desmond during the course of his foster placement. Mattie Barber testified that she visited Desmond once a month from 1963 to 1966, and between eight and 12 times since 1966; the last visit occurring at Christmas 1973. Mrs. Watson, the foster mother, testified that the three most recent visits prior to the hearing occurred in December 1971, September 1969 and about 1965. Mattie further testified that she bought Desmond a gift on most of her visits, indicating that she bought him either clothing or a game. Mrs. Watson, however, denied that Mattie had given Desmond gifts since 1966.

Mattie testified that she knew Desmond's telephone number and knew that she could visit him anytime. Although she never telephoned Desmond, Mattie felt that she did not have to worry about him when he was with Mrs. Watson. However, Mattie did not realize that Mrs. Watson might eventually be able to adopt Desmond. Desmond was also unaware that Mattie was his mother; she was just thought of by him as "the lady who comes to visit."

Mattie further explained that she left her foster home when she was 21

and thought that she "had to learn to deal with things that were going on," before she could take care of Desmond; she wanted to get herself "set up" as far as working, and get an apartment. If Desmond were returned to her, he would be cared for by her aunt or sister while she worked. Mattie also would acquire a larger apartment. She could foresee no other difficulties that would prevent her from taking Desmond.

Mattie's background reflected that she went up to the twelfth grade in school, was employed by Zenith for two years until October 1974, and never had any serious medical problems in the last 10 years.

Mrs. Healy, the caseworker, testified that she sent Mattie a letter in February 1975 advising her to come in for an interview. At this meeting, she asked Mattie to explain why she did not contact Desmond or attempt to get him back. Mattie responded that there was no specific reason but that she was not married, was living alone and was self-supporting. Mattie also stated that she wanted to do something for Desmond in the future, but could not name a specific time. The caseworker also informed Mattie at this time, that the Department intended to terminate her rights and that she thought it was best for Desmond to remain with his foster mother. The caseworker also testified that Desmond had expressed a desire to remain with and be adopted by Mrs. Watson. Mattie asked if she could visit Desmond but her request was denied since the caseworker believed that this request was made after the petition was pending.

At the close of the evidence, the guardian ad litem and the State recommended terminating parental rights. However, the court found that there was not "a sufficient showing" to justify terminating Mattie's rights. The court focused upon the fact that the natural mother herself was a foster child during the first four years of her child's life and stated, "[it] was not at all convinced [that] this mother was not lulled into a state of false security." The State failed to produce evidence demonstrating that the Department made efforts to inculcate into Mattie Barber the need for maintaining a greater degree of interest and maintaining a more consistent contact with Desmond than she had displayed. As a result, the court suggested that Mattie be given the opportunity to visit with her child and "demonstrate [that] she had a reasonable degree of interest," and concluded that she should be given "the opportunity to establish the kind of home and family life which would justify us returning the child to her eventually."

■■ The Department initially contends that the trial court's finding was against the manifest weight of the evidence. The Department insists that Mattie Barber failed to maintain a reasonable degree of interest or concern emphasizing that while she visited Desmond periodically, she failed to make other contacts; she made no phone calls, and failed to send gifts or support money. However, the facts in the cases cited by the

Department in support of this position, are clearly distinguishable from the facts in the case at bar. These cases all involved instances where an appellate court affirmed a lower court's finding of parental unfitness, and/or involved parents who had been given an initial opportunity to care for their children. (See *People ex rel. Patterson v. Patterson* (4th Dist. 1976), 36 Ill. App. 3d 484, 344 N.E.2d 226; *In re Massey* (4th Dist. 1976), 35 Ill. App. 3d 518, 341 N.E.2d 405; *In re Ladewig* (1st Dist. 1975), 34 Ill. App. 3d 393, 340 N.E.2d 150; *In re Einbinder* (1st Dist. 1975), 31 Ill. App. 3d 133, 334 N.E.2d 187; *In re Grant* (1st Dist. 1975), 29 Ill. App. 3d 731, 331 N.E.2d 219; *In re Perez* (1st Dist. 1973), 14 Ill. App. 3d 1019, 304 N.E.2d 109.) In addition, the case at bar presents a peculiar circumstance, the natural mother was living in a foster home herself at the time of her child's birth. As a result, at the outset, she was not even given a chance to care for Desmond. In fact, Desmond never even knew that Mattie Barber was his mother; he only knew her as "the lady who came to visit." In light of this impediment, Mattie's actions, while not exemplary, were not indicative of a lack of interest, concern, or responsibility, as was demonstrated in the cases cited by the Department.

In *People ex rel. Patterson v. Patterson,* the mother had not visited her child once in a two-year period, was blatantly uncooperative and appeared to be hiding from the caseworkers. In *In re Massey,* the child was removed from her parents home due to neglect; the parental home was dirty and cluttered, and the child appeared unhealthy and sickly looking. In *In re Ladewig,* the mother visited sporadically during the six years her child was in foster care, and also failed to make periodic inquiries regarding the child's welfare. In *In re Einbinder,* the mother frequently failed to visit her child after arrangements and meetings were set. Finally, *In re Grant* and *In re Perez* both involved a mother who failed to have any contact with her child from the date of its birth until five years thereafter.

■■ Moreover, it is evident under recent decisions interpreting the section of the Adoption Act dealing with adoption without the natural parents' consent (Ill. Rev. Stat. 1975, ch. 4, par. 9.1—8), that a finding of "unfit person" must be supported by clear and convincing evidence (*In re Adoption of Rich* (1st Dist. 1977), 51 Ill. App. 3d 174, 366 N.E.2d 575.) This standard of proof is not to be taken lightly. (*In re Gibson* (2d Dist. 1975), 24 Ill. App. 3d 981, 322 N.E.2d 223.) In addition, this court has recognized the inherent right which all parents have to the society and custody of their own child (*In re Grant* (1st Dist. 1975), 29 Ill. App. 3d 731, 735, 331 N.E.2d 219), and has held that this inherent right should not be abrogated without compelling reasons. (*In re Grant; In re Gonzales* (1st Dist. 1975), 25 Ill. App. 3d 136, 143, 323 N.E.2d 42.) As the court stated in *Jackson v. Russell* (3d Dist. 1951), 342 Ill. App. 637, 639, 97 N.E.2d 584:

"The welfare of the child is a much more appropriate yard stick in a custody case than in an adoption matter. Adoption, which affects the course of inheritance, deprives the child of a place in which it was placed by nature, and by force of law thrusts the child into another relationship, while severing forever and conclusively the legal rights and interests of the natural parents, and is a very different matter from a change of custody, which could be on a temporary basis."

(See also *In re Petition of Smith* (1st Dist. 1972), 4 Ill. App. 3d 261, 265, 280 N.E.2d 770.) In this context, this court has found that it is not the function of a reviewing court to substitute its judgment for that of a trial court. (*In re Hurley* (2d Dist. 1976), 44 Ill. App. 3d 260, 268, 357 N.E.2d 815.) Specifically, the court in *In re Jones* (1st Dist. 1975), 34 Ill. App. 3d 603, 607-08, 340 N.E.2d 269, 273, stated:

"[I]n determining whether in this case parental unfitness was proved by clear and convincing evidence, we bear in mind that the trial court's finding should not be disturbed unless it is contrary to manifest weight of the evidence [citation]; [and] that the credibility of witnesses is a matter we must leave·to the trier of facts [citation] * * *." See also *In re Johnson* (1st Dist. 1977), 54 Ill. App. 3d 627, 370 N.E.2d 560.

Hence, after reviewing the record in the case at bar, we are impressed with the careful manner in which the case was heard by the trial court. The law in this area emphasizes that it is "* * * efforts to carry out [one's] parental responsibilities, rather than their success, which should be considered in determining the correctness of a finding of unfitness * * *." (*In re Taylor* (1st Dist. 1975), 30 Ill. App. 3d 906, 909, 334 N.E.2d 194.) This stems from our courts recognition of certain existing impediments which could thwart an interested parent's actual visitation of his child. Traditionally, these obstacles have been lack of intelligence (*In re Gibson* (2d Dist. 1975), 24 Ill. App. 3d 981, 322 N.E.2d 223), inadequate transportation (*In re Overton* (2d Dist. 1974), 21 Ill. App. 3d 1014, 316 N.E.2d 201), financial limitations (*In re Ybarra* (1st Dist. 1975), 29 Ill. App. 3d 725, 331 N.E.2d 224), imprisonment (*Peyla v. Martin* (5th Dist. 1976), 40 Ill. App. 3d 373, 352 N.E.2d 407), and the misconduct of Department employees (*In re Taylor*). While the case at bar presents an unusual circumstance, the trial court properly noted that Mattie Barber should be given the opportunity to establish a parental relationship with her child; she was interested in Desmond and visited him "fairly frequently." In addition, her failure to express even more of an interest may have in great part stemmed from the State's failure to inculcate into her the need for maintaining a greater and more consistent contact with her child. This circumstance, coupled with the seeming unawareness she

had of Desmond's plight and the consequences of foster placement, all contribute to our sustaining the trial court's ruling in this case.

The Department also contends that the best interests of the child should be considered in determining parental unfitness. In this regard, we note that the rule for determining parental unfitness is firmly established and was articulated by the court in *In re Massey* (4th Dist. 1976), 35 Ill. App. 3d 518, 521, 341 N.E.2d 405, wherein it stated:

> "* * * [I]n a proceeding for the custody of a child, the best interests of the child is the predominate issue but that in a proceeding such as this where the rights and interests of a parent are sought to be permanently severed, the best interests of the child can be considered *only if* the court finds by clear and convincing evidence that the parent is unfit or consents to the severance [citations]." (Emphasis added.)

See also *In re Adoption of Burton* (5th Dist. 1976), 43 Ill. App. 3d 294, 356 N.E.2d 1279; *In re Shuman* (3d Dist. 1974), 22 Ill. App. 3d 151, 153, 319 N.E.2d 287.

■■ In the case at bar, Mattie Barber neither consented nor desired to relinquish her rights to her child. As the trial court did not find her to be an unfit parent, it was unnecessary for it to consider the additional aspect of the best interests of the child.

In addition, the respondent-appellee, Mattie Barber filed a motion to dismiss the instant appeal which was taken with this case. In light of our disposition in this cause, we find it unnecessary to decide the issues raised by said motion.

We conclude that the trial court's determination that Mattie Barber was not an unfit parent was not contrary to the manifest weight of the evidence, and that the judgment of the circuit court of Cook County should be affirmed.

Affirmed.

DOWNING, P. J., and STAMOS, J., concur.