*In re* DOUGLAS NITZ, JR., a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* TAMMY NITZ, Respondent-Appellant.)

Third District   No. 78-312

Opinion filed September 7, 1979.

Robert W. Esler and Jean A. Becker, both of Western Illinois Legal Assistance Foundation, of Rock Island, for appellant.

Edward Keefe, State's Attorney, of Rock Island (John X. Breslin and Terry A. Mertel, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE STOUDER delivered the opinion of the court:

The Illinois Department of Children and Family Services (hereinafter the Department) commenced this action by filing a supplemental petition in the circuit court of Rock Island County under the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 701—1 *et seq.*) requesting that Douglas Nitz, Jr., be found a neglected minor and that his parents, Tammy Nitz and Douglas Nitz, Sr., be found unfit under the provisions of the adoption act (Ill. Rev. Stat. 1977, ch. 40, par. 1501 *et seq.*). After an adjudicatory hearing, the trial court found that the appellant, Tammy Nitz, had neglected her minor child in a repeated, continuous, and substantial manner, and that both parents had failed to maintain a reasonable degree of interest, concern, or responsibility for his welfare. Accordingly, the court terminated parental rights and granted temporary custody and guardianship of the minor child to the Department.

On appeal, respondent Tammy Nitz contends (1) that the trial court's finding of neglect was against the manifest weight of the evidence; (2) that the trial court's finding of unfitness was not proven by clear and convincing evidence; and (3) that the trial court erred in admitting into evidence testimony regarding events which occurred prior to a previous adjudicatory hearing. A detailed recitation of the facts is necessary to our consideration of these contentions.

The history of this case is somewhat long and involved. Douglas Nitz, Jr., was born April 22, 1975, and resided with his mother, Tammy Nitz, until December 31, 1975. On January 12, 1976, a petition was filed pursuant to the provisions of the Juvenile Court Act (hereinafter the Act) which requested that temporary custody of Douglas be granted to the Department and the trial court entered an order granting that petition. An adjudicatory hearing was held and evidence taken on February 5, 1976. At this time Douglas was approximately 10 months old and evidence was presented that he was suffering from medical problems, had been twice hospitalized, and was failing to gain weight. Evidence that Mrs. Nitz had an attitude of indifference in regard to her child's problems and that she was uncooperative with representatives of the Department and the Rock Island County Child Abuse Team in regard to Douglas' health problems was also presented. At the conclusion of the hearing, the trial court indicated the evidence was insufficient to sustain a finding of neglect and that it desired to hear medical testimony regarding the health problems and their causes. A final hearing was had on October 27, 1976, and, after considering the requested medical testimony, the court entered a finding of neglect. A dispositional hearing was held on January 4, 1977, and the Department was appointed guardian with directions to place Douglas in

his mother's home under supervision at that time as Mrs. Nitz would obtain suitable housing.

An appeal of the trial court's decision was taken to this court and on October 20, 1977, we reversed the trial court, holding the court's adjudication of neglect was not supported by sufficient evidence. *In re Nitz* (1977), 54 Ill. App. 3d 851, 368 N.E.2d 1111.

Two days prior to our decision, Douglas was hospitalized for pneumonia and Dr. Earl Stockdale, his attending pediatrician, filed a suspected neglect report with the Department on October 24, 1977. The bases for that report were that Mrs. Nitz could not be found when Douglas was to be released from the hospital, that he had been left at home for extended periods of time with a babysitter, and that his condition indicated his nutrition was deficient. On November 1, 1977, a supplemental petition was filed and an order entered granting temporary custody to the Department. An amended supplemental petition was filed December 15, 1977, and an adjudicatory hearing held on January 12, 1978, and continued to conclusion on February 22, 1978. The trial court, indicating it regarded this as a new proceeding, found neglect and unfitness and on April 4, 1978, entered an order terminating all parental rights.

At the adjudicatory hearings of January 12, 1978, and February 22, 1978, the court heard evidence covering a period from July 1975 through February 1978. We here summarize and review only that testimony pertaining to events occurring after October 27, 1976, the date of the completion of the prior adjudicatory hearing.

Neva Hamilton, a caseworker for the Department, visited Mrs. Nitz on February 4, 1977, and found that, except for a single room, her apartment was cold, and that there were dog feces present. Unable to find the respondent at home on five occasions between March 16, 1977, and March 30, 1977, Ms. Hamilton finally located her at a laundromat on April 1, 1977. She then learned that Mrs. Nitz had not taken Douglas to the doctor upon regaining custody, a condition of his return in February 1977. On May 27, 1977, Ms. Hamilton noted Douglas did not seem to be growing. There were rats in the hallway of the building and within the respondent's apartment, there were dirty dishes in the sink and living room, half-eaten food, and a sticky and dirty floor. In June of 1977, Douglas was observed drinking soda and eating potato chips he found lying about in the living room.

A student intern with the Department, Jean Simpson, testified that she visited respondent's home on seven occasions in April and May of 1977. On May 4, 1977, she observed Mrs. Nitz give Douglas a glass of milk which looked "lumpy." When Ms. Simpson checked the carton, she found an April 14, 1977 expiration date. That was the only occasion she ever saw

Douglas having milk but did note his having "Pepsi or chips" on several occasions. Ms. Simpson testified that garbage was stacked in one corner of the kitchen and that dirty dishes were present.

Mary Nitz, the child's paternal grandmother, testified that she observed Douglas on October 16, 1977. At that time he was very ill and was vomiting. She stated that Douglas' bones were sticking out and that "he was like a piece of skin over a skeleton." Mrs. Nitz also voiced concern over her daughter-in-law's habit of leaving Douglas "with about anyone that would take care of him."

The pediatrician who filed the suspected neglect report, Dr. Earl Stockdale, testified concerning a chart he had prepared, plotting Douglas' weight gain against a standard weight chart compiled by Ross Laboratories. On November 24, 1976, the 17-month-old child weighed 18 lbs., 7 ozs. On January 12, 1978, the 30-month-old child weighed 20 lbs., 13 ozs., representing a weight gain only of 2 lbs., 6 ozs. in almost 14 months. The chart revealed the 50th percentile normative weights to be approximately 25 and 30 pounds respectively and Dr. Stockdale testified Douglas' weights fell below the third percentile. He explained that Douglas had the ability to gain weight and that he felt there was a relationship between the child's nutrition and his illnesses, in addition to the retardation in his physical growth. He also noted a problem in Douglas' eating habits as he liked to "eat on the run" and would not sit and feed himself.

Debbie Freiburg, a registered nurse specializing in pediatric nursing at Franciscan Hospital, described Douglas' condition at the time of his hospital admission as "pale, tired, listless, and extremely dirty." Nurse Freiburg stated the child was so dirty an admission bath, rarely required, was necessary, and she noted sores and a rash on his back, abdomen, and buttocks. When she questioned the respondent, Mrs. Nitz said she knew nothing about the rash and that the sores were from sitting on a splintered porch. Nurse Freiburg questioned this as the weather was cold and noted the child was wearing only a diaper.

One of respondent's landlords, Darryl Carr, testified that on the three occasions he observed Douglas, he was never even wearing a diaper. The apartment he rented the respondent had been redecorated before she moved in during July of 1977. After her eviction in November of 1977 he was forced to repaint the living room and replace the carpeting in the bedroom as it had been ruined by dog urine and feces. No rent had ever been paid.

Lisa Adams, a caseworker with the Department, was working with Mrs. Nitz in October of 1977 to effect Douglas' return to her after his hospitalization. Ms. Adams testified that she thereafter was forced to file the neglect petition as respondent did not come to her office, after

assurances of her willingness and ability to do so, to devise a case plan. Also considered were the physician's suspected neglect report and the child's history.

An advocate with the Department, Pat Mallek, first met the respondent on November 4, 1977. Although the Department provided transportation, Mrs. Nitz missed almost a third of 29 scheduled meetings with her. When Ms. Mallek first saw the respondent's apartment, she noticed a strange, strong odor which stemmed from a backed-up toilet. There were crusty plates that Ms. Mallek estimated had been in the living room and kitchen for 1 to 1½ weeks, beer cans on the kitchen table, and parts of a couch, chewed off by a dog, on the floor. Ms. Mallek testified to debris, cans and dishes on the floor and noted that "there was a pathway you could walk through but you had to watch where you were going." On November 9, 1977, the conditions in the apartment had not improved and Ms. Mallek noted the toilet had not been fixed and the presence of the same beer cans. She saw the bedroom for the first time on that day and stated she observed two beds with sheets she described as "filthy" and dirty clothes strewn about the room. On November 23, 1977, Ms. Mallek found the front window broken. Mrs. Nitz explained there had been a party and a fight occurred between two girlfriends, one of whom "was on acid and broke the window."

During their meetings, the respondent told Ms. Mallek that her driver's license had been suspended for drunk driving and she had never attempted to get it back. Mrs. Nitz was also unwilling to work toward obtaining a GED and said she hated school. Ms. Mallek evaluated the situation by indicating the respondent had made very little progress, that no solution had been followed through and added: "I have gotten no commitment as far as working toward a definite solution."

Tammy Nitz disputed the accuracy of the descriptions of the feeding of Douglas, her apartments, and her housekeeping standards but did not dispute the evidence regarding the accumulation of garbage, the occasions on which Douglas was ill, the services offered, and her refusal to use those services to obtain medical care, housekeeping assistance and transportation. She did dispute the number of dog feces found and stated she cleaned them up daily and her child was not allowed in contact with them. The trial court, in its memorandum of March 20, 1978, stated that it found the respondent's credibility suspect as to the material and relevant facts of the case.

The Act expressly sets forth the policy of the legislature:

> "The purpose of this Act is to secure for each minor subject hereto such care and guidance, preferably in his own home, as will serve the moral, emotional, mental, and physical welfare of the minor * * *." (Ill. Rev. Stat. 1977, ch. 37, par. 701—2(1).)

To this statement of policy is added:

"In all procedures under this act, the following shall apply:

* * *

(b) Every child has a right to services necessary to his proper development, including health, education and social services.

(c) The parents' right to the custody of their child shall not prevail when the court determines that it is contrary to the best interests of the child." Ill. Rev. Stat. 1977, ch. 37, par. 701—2(3).

In light of these expressions of legislative intent, we first consider the question of whether the trial court's finding of neglect is against the manifest weight of the evidence. The relevant statutory authority is section 2—4 of the Act, which provides:

"Those who are neglected include any minor under 18 years of age

(a) who is neglected as to proper or necessary support, education as required by law, or as to medical or other remedial care recognized under State law or other care necessary for his well-being, or who is abandoned by his parents, guardian or custodian; or

(b) whose environment is injurious to his welfare or whose behavior is injurious to his own welfare or that of others." Ill. Rev. Stat. 1977, ch. 37, par. 702—4(1).

A determination of neglect under the statute is, of course, in the province of the circuit court, and it is a difficult determination which necessarily varies with each case. The Supreme Court of Illinois has said:

"* * * Neglect, however, is the failure to exercise the care that the circumstances justly demand. It embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes." (*People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 624, 104 N.E.2d 769, 773, *cert. denied* (1952), 344 U.S. 824, 97 L. Ed. 642, 73 S. Ct. 24.)

The standard of proof in neglect cases is a preponderance of the evidence (Ill. Rev. Stat. 1977, ch. 37, par. 704—6) and only where there has been an abuse of discretion or the judgment has been against the manifest weight of the evidence should the decision be disturbed on appeal. *In re Stilley* (1977), 66 Ill. 2d 515, 363 N.E.2d 820.

In the case at bar, voluminous evidence was presented concerning the minor child's environment and medical condition. Respondent's first apartment was found cold, filthy, and unkept. Witnesses testified to the

presence of debris, garbage, half-eaten food, rats, and dog feces. Mrs. Nitz provided no better environment for her child in her second apartment. Again her residence was masked by the presence of debris, garbage, old food, and dog feces. Witnesses additionally testified to the existence of filthy sheets, plumbing problems, and dog urine.

■■ Douglas Nitz was portrayed as a pale, tired, listless and dirty child. His grandmother described him as a piece of skin over a skeleton and his weight fell below the third percentile for children his age. On the occasion of the hospital admission that preceded the suspected neglect report, he had a rash over much of his body and sores from splinters from the porch on which he was allowed to sit. His diet was described as nutritionally deficient and the only milk he was seen to consume was two weeks old. After examining these and the other facts of this case, we cannot say that the adjudicatory finding of neglect is an abuse of discretion or is not supported by the manifest weight of the evidence.

■■ We next consider the question of whether the trial court's finding of unfitness is supported by clear and convincing evidence. The relevant statutory authority is section 1 of the adoption act which provides:

> "* * * 'Unfit person' means any person whom the court shall find to be unfit to have a child sought to be adopted, the grounds of such unfitness being any one of the following:
> * * *
>
> (b) Failure to maintain a reasonable degree of interest, concern and responsibility as to the child's welfare;
> * * *
>
> (d) Substantial neglect of the child if continuous repeated; * * *." (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D).)

Only if the trial court finds a nonconsenting parent unfit under the above definition, after a minor child is adjudged a ward of the court under the Act, may a guardian with power to consent to an adoption be appointed (Ill. Rev. Stat. 1977, ch. 37, par. 705—9). The standard of proof in parental unfitness cases is that the evidence must be clear and convincing (*In re Gates* (1978), 57 Ill. App. 3d 844, 373 N.E.2d 568; *In re Barber* (1977), 55 Ill. App. 3d 587, 371 N.E.2d 299; *In re Ybarra* (1975), 29 Ill. App. 3d 725, 331 N.E.2d 224) and the trial court's decision should not be disturbed on appeal unless against the manifest weight of the evidence. *In re Gates*; *In re Ice* (1976), 35 Ill. App. 3d 783, 342 N.E.2d 460; *In re Jones* (1975), 34 Ill. App. 3d 603, 340 N.E.2d 269.

In addition to the evidence previously referred to in our discussion of neglect, abundant testimony was presented directly reflecting the respondent's unfitness. After regaining custody of her son, she failed to take him to the doctor or provide him with the nutrition he needed. Douglas was allowed to eat food lying about and drink lumpy milk. He

was left with anyone who would take care of him and allowed to remain naked in respondent's apartment. When the child was hospitalized, his mother was unaware of a rash covering much of his body but was aware that sores had been caused from splinters from a porch, where presumably Douglas had been allowed to play in October, dressed in a diaper. When he was to be released from the hospital, his mother could not be found. Over time, the environment which Douglas was exposed to remained dirty and disorderly, and Mrs. Nitz made little progress in improving, or making a commitment to improve, that environment or the other problems to which we have referred. In the words of the trial court:

> "The sum and substance of all the believeable testimony is that Tammy Nitz, the mother, neglected her child; that she failed to seek proper medical attention for the child; that the child had recurrent and persistent illnesses which were caused or aggravated by the mother's inability or unwillingness to provide a minimum standard of cleanliness, proper feeding and attention; * * *."

In this case, there was abundant testimony concerning the respondent's neglect and unfitness to retain custody of the child, only part of which has been here set forth. The Department engaged in a lengthy and unsuccessful attempt to assist Mrs. Nitz with the most intensive help at its disposal and this attempt continued for over two years. It is not the function of this court to substitute its judgment for that of the trial court, and we conclude its decision was not contrary to the manifest weight of the clear and convincing evidence presented and was in the best interest of the minor child.

Counsel for both the respondent and the People have cited a number of legal precedents. We cannot say that any of them is so close to the case at bar as to constitute binding authority. Under these circumstances, there is no need to discuss the various attempted differentiations presented by the parties.

As we have considered only that evidence relating to events occurring after October 27, 1976, we do not reach the question of whether the trial court erred in admitting testimony regarding events which occurred before that date.

Accordingly, the order of the circuit court of Rock Island County is affirmed.

Affirmed.

ALLOY and BARRY, JJ., concur.