78 Ill. App.3d 319 (1979)
397 N.E.2d 178
In re FALEH AL SAADOON, a Minor.  (THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee,
v.
DANA AL SAADOON, Respondent-Appellant.)
No. 78-1910.
Illinois Appellate Court  First District (1st Division).
Opinion filed November 13, 1979.
*320 James J. Doherty, Public Defender, of Chicago (Frances Sowa, Assistant Public Defender, of counsel), for appellant.
Bernard Carey, State's Attorney, of Chicago (Marcia B. Orr and Wesley H.H. Ching, Assistant State's Attorneys, of counsel), for the People.
Judgment affirmed.
Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:
Dana Al Saadoon (respondent) was adjudicated an unfit parent for failure to make reasonable efforts or reasonable progress toward return of her minor child to her custody. (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D)(m).) The trial court entered an order appointing a guardian authorized to consent to the adoption of respondent's child. Respondent appeals.
Faleh Al Saadoon, respondent's minor child was born on September 8, 1970. On September 7, 1973, pursuant to a finding of neglect and inability of respondent to care for him, Faleh became a ward of the court. The record shows Faleh had been ingesting various harmful objects such as glass. Respondent was referred to the Illinois Department of Children and Family Services (Department). On December 1, 1973, respondent filed a petition for return of Faleh to her custody. This petition was denied. In due course Faleh was placed with foster parents.
The Department first petitioned to terminate respondent's parental rights on October 25, 1975. It alleged respondent had failed to make reasonable progress within 24 months to regain the custody of Faleh. The petition was denied.
On March 15, 1978, a second petition was filed by the Department alleging the failure of respondent to make reasonable progress toward return of the child. This petition was granted. Respondent's parental rights were terminated and a guardian was appointed and authorized to consent to Faleh's adoption. Respondent appeals.
At the hearing, Mary Roberts, Department caseworker, testified she was assigned to the case from January 1975 to June 1975. She spoke with respondent several times. On eight occasions, respondent refused to discuss plans for caring for Faleh if he returned, what job or school situation she was in or whether she was receiving treatment. Respondent said these things were irrelevant and none of Roberts' business. Roberts testified it was her opinion respondent had not made reasonable progress in correcting the conditions which led to the removal of her son. Roberts found respondent's apartment neat, clean, adequately furnished and *321 suitable for a child. After several unproductive discussions, Roberts told respondent she was going to transfer the case to the adoption unit of the Department because she believed Faleh needed permanent planning.
After refreshing her recollection on cross-examination, Roberts testified respondent had told her in December 1975 that she was receiving therapy. The caseworker was unable to verify this information because respondent refused to sign a release of confidential information.
Leslie Sollitto, caseworker, was assigned to the case after it was transferred to the adoption unit. She initially prepared the case for the hearing on the first petition to terminate respondent's parental rights, filed October 25, 1975. She met respondent for the first time in January 1976. She testified respondent remained hostile and uncooperative. Respondent told her she was attending a school for beauty operators and was receiving therapy but refused to allow any verification of her school attendance and only allowed the clinic to say she was receiving therapy. Respondent agreed to see a therapist referred to her by the Department. She stopped these visits after one month because she felt the doctor was in an undesirable neighborhood.
Respondent refused to enter into a service contract agreement with the Department. Such an agreement would outline goals to be met by a parent to enable return of children to their custody. Respondent directed threats to the social workers and to Faleh's foster parents in the presence of the child. Respondent's visitations with Faleh were limited and occurred only in the Department offices during this period. This was because of respondent's lack of cooperation, her threats and the upsetting effect of her visits on the child. In Sollitto's opinion, respondent had not made reasonable progress toward the return of the minor to her custody.
In June 1977, caseworker Al Long was assigned to work with respondent. Sollitto continued to work with Faleh and the foster parents. Long presented a service agreement to respondent which contained provisions regarding access by the Department to information concerning the therapy, employment, schooling and medical care of the respondent and her visitation with Faleh. Respondent initially refused to read the agreement. Thereafter, upon reading it, she requested several changes: Faleh was to attend a mosque and was not to eat pork, respondent was to meet the foster parents, respondent was to be involved in Faleh's schooling and therapy, the Department was to contact respondent only through Long or by certified mail, respondent would be excused from work when she did not feel she could attend and respondent would receive weekend visitation with Faleh.
Long testified all of respondent's requested modifications were not accepted by him. He believed some of these conditions were not in Faleh's best interests. Some provisions, regarding the mosque and the *322 eating of pork, had already been implemented. Some of the suggested amendments were accepted. The altered agreement was sent to respondent and was rejected by her. (It is not clear from the record precisely what changes were made in the agreement.)
Respondent provided Long with confirmation that she was attending beauty school, told him she had completed a training program for security guards, allowed him to receive information from her therapist and told him she was doing volunteer work at a hospital. Long allowed respondent to visit Faleh outside of the Department but refused to increase the time allotted for visitation. This was due to respondent's difficulty in controlling the child's behavior. Respondent continually refused to enter into a service contract agreement. Long stated that in his opinion respondent had not made reasonable efforts to correct the conditions which led to the removal of Faleh from her custody.
Respondent testified she had returned to school and completed her elementary and secondary education in 1966. She was then currently attending beauty school and was scheduled to graduate in October 1978.
Respondent refused to sign the service contract because none of her suggested revisions were made and she objected to the existing provisions. She also testified that she was not satisfied with her relationship with Sollitto who had threatened her and had denied a request by her sister and brother-in-law to become foster parents of Faleh.
She testified the service contract should have been amended by allowing her more visitation rights; allowing her to become involved in Faleh's school; permitting a meeting by her with the foster parents to ascertain the condition of the child; provisions that Faleh would attend a mosque and stipulations for joint therapy with Faleh combined with weekend visits. She also objected to the existing provisions of the contract which provided that she have counseling once a week for approximately 40 weeks. She disagreed with the choice of a doctor by the Department and felt that she should be permitted to choose her own doctor.
The trial court found respondent had not made reasonable efforts to correct the conditions which led to removal of Faleh from her custody and had not made reasonable progress toward the return of her child. The court also found Faleh's father was unfit because of lack of interest and concern for the child's welfare.
The trial court then heard testimony from Laya Frischer, a child psychotherapist, who had been working with Faleh since March 1976. She had never met or interviewed the respondent. Frischer testified it was her opinion that an adoption was in Faleh's best interests. Additionally, she stated Faleh's foster parents had become his psychological parents and "that in order to continue good development he needs to belong to them."
*323 The court then made a finding that it was in the best interests of Faleh that a guardian be appointed with authority to consent to his adoption.
Respondent contends that the State did not prove by clear and convincing evidence that she was an unfit parent. She urges specifically that her rejection of the service contract was not unreasonable, and she was not shown to have failed to make reasonable efforts or progress toward the return of her child.
Under the law of Illinois, a child may not be adopted without consent of the natural parents unless the parents are unfit persons. (Ill. Rev. Stat. 1977, ch. 40, par. 1510, and Ill. Rev. Stat. 1977, ch. 37, par. 705-9.) The concept of unfitness as applied in the instant case is defined by the statute (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D)(m)) as:
"Failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child from his parents or to make reasonable progress toward the return of the child to his parents within 12 months after an adjudication of neglected minor * * *."
 1 "Reasonable progress" is defined as requiring "at a minimum measurable or demonstrable movement toward the goal of return of the child. Whether a small amount of progress is `reasonable' must be determined with proper regard for the best interests of the child." (In re Austin (1978), 61 Ill. App.3d 344, 350, 378 N.E.2d 538.) Additionally, this court has held that the "essence" of the above section of the statute "`is that the parents whose child has been taken from their custody to protect the child are unfit if they do not make reasonable efforts to change themselves and their circumstances so that they can give the child the care it needs. If they fail to do this adoption of the child should be permitted if the child's best interests so require.'" In re Gates (1978), 57 Ill. App.3d 844, 852, 373 N.E.2d 568, citing In re Massey (1976), 35 Ill. App.3d 518, 341 N.E.2d 405.
A primary purpose of this provision of the statute which defines "unfit" is "to give greater protection to the best interests of the child." (Gates, 57 Ill. App.3d 844, 852.) In this type of situation, proof of unfitness of a natural parent must be made by "clear and convincing" evidence. (In re Sparrow (1978), 59 Ill. App.3d 731, 739, 376 N.E.2d 236.) In these cases, "the court is in the best position to judge the demeanor and credibility of the witnesses [citation], and this is a vital factor in evaluating the correctness of the court's determination, which should not be disturbed unless it is against the manifest weight of the evidence." In re Martin (1977), 48 Ill. App.3d 341, 344, 363 N.E.2d 29.
Analysis of the evidence shows strong testimony by three Department caseworkers. All three of them expressed the opinion that respondent had not made reasonable progress in correcting the conditions which *324 originally led to the removal of her son from her custody in 1973. Respondent has attempted to contradict this by her testimony regarding her efforts in attempting to establish herself and to show progress in overcoming her difficulties. In this regard respondent sought to show that the caseworkers were hostile to her and failed to cooperate. On the contrary the caseworkers cite various instances in which they assert that there was a lack of cooperation and a hostile attitude emanating from the respondent. There is divergence in the two sides of this testimony, most of which alludes to details. In addition, it would be difficult to conclude that all three of the workers assigned to this case would in turn be hostile to respondent without any apparent motive or reason for this attitude.
Respondent also asserts that her refusal to enter into the service contract agreement was not unreasonable because the agreement violated her constitutional and statutory rights. Respondent bases this assertion on the fact that the contract did not assure that her child would practice the Moslem religion. Respondent cites Pierce v. Society of Sisters (1925), 268 U.S. 510, 69 L.Ed. 1070, 45 S.Ct. 571, and Wisconsin v. Yoder (1972), 406 U.S. 205, 32 L.Ed.2d 15, 92 S.Ct. 1526, in support of the proposition that "[p]arents have the inherent right to assure their children's religious upbringing without governmental interference." Respondent also contends her objections concerning the provisions of the contract relating to her therapy were not unreasonable because of the confidential nature of therapy which is recognized by statute. Respondent cites Ill. Rev. Stat. 1977, ch. 51, par. 5.2, and Ill. Rev. Stat. 1977, ch. 111, par. 5306.
Respondent's contentions lack merit. Mr. Long told respondent, and also testified at trial, that arrangements had been made for Faleh to attend mosque, and his foster parents had been told that he should not eat pork. As regards respondent's therapy, upon denial of the first petition to terminate respondent's parental rights, the trial court specifically instructed the Department to involve respondent in a treatment program and admonished respondent to accept such treatment. The inclusion of the therapy provision in the service contract agreement was an attempt by the Department to comply with the court's order. It must not be forgotten that Faleh was adjudicated a neglected minor and was a ward of the court. He had come to the court as a result of his injurious behavior and his mother's inability to control him. Also, we gather from the record that therapy for respondent was indicated. The trial court's insistence on a therapy program to be monitored by the Department was therefore reasonable. Without such a program the Department would be unable properly to fulfill its role and would not be able to advise the court of any progress made by respondent toward correcting those conditions which had led to Faleh's removal from respondent's custody. Respondent did not enjoy the position generally held by parents to their children. Faleh *325 had been removed from the custody of his mother. The court had become his guardian. Respondent was obliged to demonstrate that she had made reasonable progress toward becoming a fit parent and regaining custody of her child.
In cases of this type we must constantly remember that the trial court had the best opportunity to evaluate the testimony and demeanor of all of the witnesses and to judge their credibility. Therefore, in cases involving the fitness of natural parents, this superior vantage point of the trial court "is a vital factor in evaluating the correctness of the court's determination, which should not be disturbed unless it is against the manifest weight of the evidence * * *." (Martin, 48 Ill. App.3d 341, 344.) It has also been held that cases of this type "are sui generis and must be decided in accordance with the particular facts of each situation." Martin, 48 Ill. App.3d 341, 344.
 2 Considering all of the evidence and all of the factors above set forth, we conclude that the judgment order appealed from finding the unfitness of respondent under the pertinent statute is predicated upon clear and convincing proof. The result reached by the trial court is in accordance with the manifest weight of the evidence.
We must also remember the testimony of the child psychotherapist. This person, a qualified expert, had been working with Faleh since March of 1976. She testified that adoption of Faleh was in the best interest of the child. She based this upon her analysis that his foster parents had actually become his parents from a psychological point of view. It must be recalled that the child has been in the continuous custody of the foster parents since 1973. He has spent the greater part of his life with the foster parents from the time he was 3 years old until the present when he is over 9. It would seem difficult and perhaps even harmful to the child to return him to his natural mother at this time.
This type of situation and the possible dangers which a transfer of custody might cause to the child has been graphically described in psychological writings. See A. Freud, Infants Without Families and Reports on The Hampstead Nurseries 182-83 (1974).
The judgment appealed from is accordingly affirmed.
Judgment affirmed.
O'CONNOR and CAMPBELL, JJ., concur.