*In re* LEE ANN GROTTI, a Minor.—(THE PEOPLE OF THE STATE OF ILLINOIS, Petitioner-Appellee, *v.* SHEILA BERRY, Respondent-Appellant.)

Fifth District    No. 79-416

Opinion filed July 7, 1980.

Barbara Adams, of Litchfield, for appellant.

Patrick J. Hitpas, State's Attorney, of Carlyle (Martin N. Ashley and Nicholas B. Svalina, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mme JUSTICE SPOMER delivered the opinion of the court:

This appeal is from the order of the circuit court of Clinton County, finding Gilbert Grotti, father, and Sheila Berry, mother, to be unfit parents, terminating their parental rights in the minor child, Lee Ann Grotti, and granting the guardianship administrator of the Department of Children and Family Services, State of Illinois, the power to consent to the adoption of said minor. Only respondent Sheila Berry appeals.

Lee Ann Grotti was born October 1, 1969. The record discloses that from the time she was three years of age, Lee Ann has been moved repeatedly from placement in foster homes back to the mother, then back again to foster home placement. Her first contact with the Department of Children and Family Services was in September 1972, when her father brought her and her younger sister Tina to the police department, stating that the mother did not want them. The children were placed by the Department for approximately two months, then returned to the mother.

Approximately one month thereafter, the children were again removed from the home because of fighting between the parents, as a

result of which Sheila was hospitalized. This placement continued for four months, when the children were again returned to their mother, who had then divorced Gilbert Grotti.

A short time later, in May 1973, the children were returned to the Department because Sheila had been arrested for driving while intoxicated, and the judge advised the Department to make placement because she was to be incarcerated. This placement continued for approximately two years, until March 28, 1975.

During this period, Sheila had married and divorced William Sloat and then married Wilford Rapp. When Lee Ann and Tina were returned to Sheila in March 1975, the guardianship was discharged, as the family planned to move to New Jersey; however, within six months they again returned to Illinois. On July 10, 1975, according to the testimony of Diane Doran, a social worker for the Department, Sheila called their office and requested a surrender of daughter Tina for adoption. The child was then placed, and Sheila signed the consent for adoption. Sheila had two daughters as a result of her marriage to Rapp, and when she divorced him in September 1977, he was given custody of these children with her approval.

On March 10, 1977, the Department again took Lee Ann as a result of a call from the Salem police department, who had received the child from Karen Grotti, the ex-wife of Gilbert Grotti. Karen had reported that Lee Ann was left with her by Sheila, who failed to make any arrangements for the child's return. When Sheila did reappear, the Department again returned the child to her on March 23, 1977.

On August 4, 1977, the Department again placed Lee Ann as a result of a complaint from Betty Garner that the child had been left with her for approximately 18 days. Sheila had picked the child up once again; but the following night Bill Roberts, operator of Bill's Playhouse, a Carlyle tavern, had taken her back to Mrs. Garner to stay for "a week or so." Mrs. Garner refused to accept her, and it was later learned that Sheila and the child slept in a car that night. During the period Mrs. Garner had Lee Ann, Sheila was arrested for fighting in another city. As a result of Sheila's failure to furnish necessary and proper support for the minor, on August 8, 1977, the Department filed a petition to have Lee Ann declared a neglected child. At the hearing, appellant voluntarily stipulated to an adjudication of her neglect of the child as alleged, and Lee Ann became a ward of the court. During this period, Sheila was living with Bob Berry, whom she married shortly thereafter. On December 1, 1977, after Sheila's marriage, the child was again returned to her.

In August 1978, the Department learned that Lee Ann was no longer registered in school, and upon investigation learned from Mrs. Laura Jahnssen that Sheila and the minor were living in a tent while the mother

worked on a railroad section crew. The crew and their families moved along the track from one place to another as their work progressed; some lived in the bunk car, some in tents, some in campers. Mrs. Jahnssen—whose husband worked on the railroad with Sheila—stated that Sheila had left Lee Ann with her for a two-week period, and that during this period, the mother made no contact with the child. Before Mrs. Jahnssen took Lee Ann in, the child sometimes stayed alone at night in the tent. She also reported that Sheila was using drugs in her presence and the child's presence, and related that the child was sometimes left without food. As a result of this information, on September 8, 1978, Mike Wilton, the caseworker for the Department, went to the Carlinville school and talked directly to Lee Ann, now age eight. The minor told him there were problems in the home and it might be a good idea for her to go back in foster placement. Placement was made, and continued up until the time of the hearing involved herein.

The Department followed this placement on February 6, 1979, with a petition to terminate parental rights and for authority to consent to the adoption of Lee Ann, alleging unfitness of the parents. The grounds alleged as to Gilbert Grotti are not involved in this appeal. As to Sheila, the grounds alleged are substantially as follows: abandonment; failure to provide food; use of drugs; excessive use of alcohol; open and notorious adultery and fornication; marriage to four different men during said minor's lifetime; substantial neglect for more than six years; and a failure to make reasonable efforts to correct conditions which were the basis for the removal within two years of the neglect finding.

The trial court by order of May 9, 1979, found that Sheila Berry is an unfit parent, terminated her parental rights, and placed guardianship with the Guardianship Administrator of the Department of Children and Family Services, State of Illinois, with power to consent to the adoption. This appeal follows. We affirm.

Respondent contends that (1) the State did not prove by clear and convincing evidence that she was an unfit parent; and (2) that a general finding of unfitness cannot stand when the trial court did not state the specific statutory ground of unfitness found to have been proved and failed to state what standard of proof was applied.

As to the first issue, respondent argues that the evidence did not prove any of the statutory grounds alleged—(1) abandonment, (2) substantial, repeated neglect, (3) open and notorious adultery or fornication and (4) failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child within 24 months of an adjudication of neglect. The State concedes that abandonment has not been proved.

Under the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 705—9(3)), parental rights of a nonconsenting parent can be terminated only if the parent is found unfit under the provisions of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501 *et seq.*). A finding of unfitness as the basis for terminating parental rights must be supported by clear and convincing evidence. (*In re Ybarra* (1975), 29 Ill. App. 3d 725, 331 N.E.2d 224; *In re Gates* (1978), 57 Ill. App. 3d 844, 373 N.E.2d 568.) This finding will not be disturbed by the reviewing court unless palpably against the manifest weight of the evidence. (*In re Ice* (1976), 35 Ill. App. 3d 783, 342 N.E.2d 460; *Gates*, 57 Ill. App. 3d 844, 851.) The determination of the trial court must be afforded great weight upon review since it is in a superior position to judge credibility of the witnesses. *In re Al Saadoon* (1979), 78 Ill. App. 3d 319, 397 N.E.2d 178.

The Supreme Court of Illinois in the case of *People ex rel. Wallace v. Labrenz* (1952), 411 Ill. 618, 104 N.E.2d 769, 773, *cert. denied* (1952), 344 U.S. 824, 97 L. Ed. 642, 73 S. Ct. 24, has defined "neglect" as relating to the statute dealing with neglected children as follows:

"Neglect * * * is the failure to exercise the care that the circumstances justly demand. It embraces wilful as well as unintentional disregard of duty. It is not a term of fixed and measured meaning. It takes its content always from specific circumstances, and its meaning varies as the context of surrounding circumstances changes."

At the hearing on the supplemental petition to terminate parental rights and for authority to consent to adoption, Thomas Brasher, social worker for the Department, testified that he first became involved in the case when Karen Grotti placed the child in the protective custody of the Salem police department on March 10, 1977, after Sheila had left the child with her and did not return. His investigation showed that the placement with Karen was an indefinite arrangement until such time as Sheila wanted Lee Ann. Sheila's whereabouts at that time were unknown, and it was four days thereafter before she made any contact with the Department. This witness testified that at the time the minor was placed, she had few clothes, no underwear, and one pair of shoes, which were too small. He also testified that he found evidence in the apartment where appellant was then living—and was so advised by another occupant, Ruth Hongsermeier—that a knife fight had recently occurred in the home. He stated that he saw a hole knocked in the wall, dried blood on the wall, and a lampshade which had apparently been damaged by a knife. Sheila admitted to Brasher that the fight had occurred, although she denied being present. She also admitted that she sometimes took Lee Ann into taverns.

Laura Jahnssen, who lived in the tent camp next to Sheila, testified that she had observed Sheila in the presence of the minor taking drugs which in her opinion were "speed" or "acid." At that time, Sheila stated that she thought she was pregnant again and was taking drugs "to get rid of it." She invited Mrs. Jahnssen to use drugs with her, "to get high." She testified that after taking the drug, Sheila "got real far out, and she'd say weird things." She also testified that Lee Ann was left alone in the tent in the railroad camp many times, both during the day and in the nighttime, and that she had heard the child cry herself to sleep on occasion. Sheila did not provide food for Lee Ann when she left the child during the daytime, although sometimes at night she took the child to a restaurant to eat or brought her a "nosebag," a bag containing sandwiches, which the railroad prepares for its workers. She stated that Sheila and Lee Ann sometimes stayed in a camper with the foreman, Jan Hollman. Both Mr. and Mrs. Jahnssen testified that since Sheila was not taking care of the child, they looked after the child and on one occasion kept her for two weeks, during which time Sheila never inquired of them or came to visit the child.

On another occasion, the testimony showed that Sheila and Lee Ann lived temporarily with one of appellant's girl friends, where the walls of the house contained posters with obscene language.

Anne Marie Sons, a homemaker for the Department of Children and Family Services, testified that she worked with appellant for 3½ months in 1977. At various times during this period she found Sheila was living with her boyfriend, Steve Goff. Mrs. Soms obtained employment for Sheila in a nursing home, secured uniforms for her to wear, and secured food for the family. However, Sheila quit the job after 14 days, telling Mrs. Sons that she hated the place and it "just gives me the creeps." Sheila moved so many times that the public aid department could not keep in contact with her and as a consequence, her public assistance check was always late in arriving. Mrs. Sons testified that "Lee Ann was always worried about where her next day's food was coming from." She stated that Lee Ann was left with an unreliable babysitter, a Lance family, whom she knew because she was also assigned to work with them. She often saw Lee Ann walking the streets with one of the small Lance children and would advise Lee Ann to go home. One such time Mrs. Sons ascertained that Sheila had gone fishing with her boyfriend, leaving the child unattended. During this period Melissa Rapp, Sheila's daughter, was also living with them. On one occasion Sheila told Mrs. Sons that she wished Buddy Rapp, the child's father, would take the child because "she's not worth the $40 that I get for her." Although Mrs. Sons stated that in her opinion Sheila loved Lee Ann, she (Sheila) was always more concerned about herself than the child; Sheila had no patience with the children and was always angry with them.

Mrs. Sons visited the home five times a week, and it sometimes took her two or three hours to find Sheila on these visits.

Joyce McGuire testified on behalf of Sheila. Her husband worked on the railroad with Sheila. She testified that the child was well cared for by her mother, and was always either in the tent or camper with Sheila or in the tent with "Vickie." She denied that Sheila used drugs or alcohol.

Sheila Berry testified that she never left Lee Ann unsupervised and that Betty Garner and Laura Jahnssen were paid to babysit. She testified that the obscene posters on the wall belonged to Linda Eaglehoff, with whom she and Lee Ann lived temporarily at that time. She also testified that she and Lee Ann sometimes stayed with Jan Hollman in his camper. She admitted having intimate relations with Hollman, but denied that such took place when Lee Ann was present. On such occasions, she testified that Lee Ann would "sleep with Vickie in the tent." Although she first admitted committing adultery, she subsequently denied it. She did, however, admit living with Bob Berry before her marriage to him and later with Steve Goff. A summary of a portion of her testimony is helpful:

"Q. Now Mrs. Berry isn't it really a fact that when you do leave Lee Ann—

A. Yes.

Q. And whenever convenient you'd like to have her with you?

A. I'd like to have her with me all the time.

Q. But in the past it's been when it's been convenient with you you'd like to and when you wanted to run at night you'd leave her elsewhere?

A. When I'd go out at night, yes, I do leave her elsewhere.

             * * *

Q. So its basically still whenever it's convenient for you to keep her you'd like to and whenever it's convenient for you to go about doing whatever you want to at night.

A. I want to keep her with me all the time. That doesn't mean that I have to stay home all the time.

             * * *

Q. Has Lee Ann ever told you that she'd like to stay with you if you'd straighten up?

A. She's told me.

Q. Said something to that effect?

A. She wants me to straighten up, that's what she said, about the men.

Q. When she says straighten up, what does she mean?

A. She means about the men. She doesn't like the men.

Q. Does it bother Lee Ann that you've lived with various men without the benefit of marrying them?

A. I don't know. I've talked to her. I've explained that marriage hasn't been working for me so there's no sense in getting married just to go through the divorce again. She understands that."

■■ We think the evidence of fornication, of substantial and repeated neglect, and of failure to make reasonable efforts to correct the conditions which led to the original adjudication in this case was clear and convincing, and supports the finding of appellant's unfitness. In the recent case of *Jarrett v. Jarrett* (1979), 78 Ill. 2d 337, 346, 400 N.E.2d 421, 424, the Illinois Supreme Court found open and notorious fornication to be an affront to public morality and relevant to a custody decision, stating:

"The fornication statute and the Illinois Marriage and Dissolution of Marriage Act evidence the relevant moral standards of this State, as declared by our legislature. The open and notorious limitation on the former's prohibitions reflects both a disinclination to criminalize purely private relationships and a recognition that open fornication represents a graver threat to public morality than private violations. Conduct of that nature, when it is open, not only violates the statutorily expressed moral standards of the State, but also encourages others to violate those standards, and debases public morality."

Appellant's immoral conduct extended over a long period of the time involved in this case. She lived with Steve Goff for nine or 10 months, then with Robert Berry, and later with Jan Hollman. These relationships were open and notorious and substantiated by the testimony of many witnesses. Both Tom Brasher and Anne Marie Sons testified that Steve Goff lived with her. Michael Wilton testified that she lived with Robert Berry. Mr. and Mrs. Jahnssen both testified that she lived with Jan Hollman; appellant's own testimony substantiates this, as well as that of Joyce McGuire. Even the child said she "doesn't like the men" in her mother's life.

Leaving a child with neighbors for indefinite periods of time and failing to provide sufficient food for the child are further factors which the court may consider in determining whether substantial and repeated neglect exists. (*In re Garmon* (1972), 4 Ill. App. 3d 391, 395, 280 N.E.2d 19, 21.) Evidence of the use of drugs is also a proper consideration. (*In re Gomez* (1977), 53 Ill. App. 3d 353, 358, 368 N.E.2d 775.) The evidence introduced regarding Sheila's pattern of consistently leaving the child with others for indefinite periods is abundant and need not be repeated. Mrs. Jahnssen testified as to Sheila's drug use, and both she and Anne Marie Sons told of her failure to provide food for the child.

Section 1(D)(m) of the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D)(m)) provides in part:

"Failure to make reasonable efforts to correct the conditions which were the basis for the removal of the child from his parents * * * within 12 months after an adjudication of neglected minor under Section 2—4 * * * of the Juvenile Court Act."

"Reasonable efforts" under this statute has been interpreted in the case of *In re Massey* (1976), 35 Ill. App. 3d 518, 523, 341 N.E.2d 405, 409, as follows:

"[T]hat the parents whose child has been taken from their custody to protect the child are unfit if they do not make reasonable efforts to change themselves and their circumstances so that they can give the child the care it needs. If they fail to do this adoption of the child should be permitted *if the child's best interests so require.*"

Appellant argues that this is a subjective standard, not focusing on objective results, so that the question is not whether Sheila made actual progress toward return of the child, but merely a reasonable effort to correct the conditions. Although we do not quarrel with the rule proposed, we disagree with appellant's interpretation of the evidence pertaining to her "reasonable efforts." By her own admission she failed to give Lee Ann the proper and necessary support when the original adjudication was made in this case. Furthermore, based on the evidence in this record, the trial court could have found that it was clearly and convincingly shown that Sheila Berry has failed to make reasonable efforts to correct these conditions (see *Massey*, 35 Ill. App. 3d 518, 523), this finding being implicit in the judge's statement:

"This started way back in 1972. *You've done very little if anything to take care of the situation since that time.* * * * you haven't worked to try to make a home for this little girl and it isn't because you don't have money. I'm not criticizing you because your lifestyle is somewhat different. But I am criticizing you because you weren't there to take care of her at times when you should have been. And she stated this herself when we were talking to her." (Emphasis ours.)

It is apparent that the testimony of Lee Ann—who was 10 years old at the time of the hearing—was an important consideration of the trial court:

"THE COURT: What do you think of your mother? Do you get along with her or what has been your situation?

LEE ANN GROTTI: Well sometimes, most of the time she goes out and drinks and stuff like that.

THE COURT: When, do you go with her when she does that?

LEE ANN GROTTI: Yes.

THE COURT: What happens to you?

LEE ANN GROTTI: I stay at home by myself.

THE COURT: I think from what I've heard your mother loves you.

LEE ANN GROTTI: Yes.

THE COURT: Do you think that too?

LEE ANN GROTTI: I don't know.

THE COURT: You don't know. Well I think she does. I think maybe she's had some problems during the time. But I think that, do you think that she'll ever change so that she would stay home and take care of you like most mothers do?

LEE ANN GROTTI: I don't know.

\* \* \*

MS. ADAMS: \* \* \* How do you feel about your mother?

LEE ANN GROTTI: Not very happy.

MS. ADAMS: Not very happy. Do you love her?

LEE ANN GROTTI: Yes.

\* \* \*

THE COURT: You get along with most of them [sisters, father and step-father, Buddy Rapp] except your mother?

LEE ANN GROTTI: Yes.

THE STATE: Lee Ann do you ever remember staying in a tent sometimes?

LEE ANN GROTTI: Yes, that was when she was working on the railroad.

THE STATE: Where did you stay then? Did you stay out in the tent some nights?

LEE ANN GROTTI: Yes.

THE STATE: Tell us about that. How did all that work out there?

LEE ANN GROTTI: Well we had a partner. I don't know if it was a partner, but her name was Vickie and when it was raining we stayed in the tent and there isn't really much to say about it. I was kind of scared.

THE STATE: Did you ever stay alone in the tent?

LEE ANN GROTTI: Sometimes.

THE STATE: At night?

LEE ANN GROTTI: Yes.

\* \* \*

MS. ADAMS: If your mother ever straightened out and either got married or you know, didn't have boy friends over and had a job and a place to stay would you ever want to go back to her if all those things straightened out?

LEE ANN GROTTI: Yeah.

MS. ADAMS: You would?

LEE ANN GROTTI: Yes.

THE COURT: Do you ever think she'd get them straightened out?

LEE ANN GROTTI: I don't know.

MS. ADAMS: Do you think she's trying?

LEE ANN GROTTI: I don't know.

* * *

THE STATE: When you were out by the railroad, did you sometimes stay in a camper?

LEE ANN GROTTI: Yes.

THE STATE: Whose camper was that?

LEE ANN GROTTI: Jan's.

THE STATE: Jan's?

LEE ANN GROTTI: I don't know his name.

THE STATE: Did you stay in there some nights too?

LEE ANN GROTTI: Yes.

THE STATE: If your mom wasn't home, did you know where she was?

LEE ANN GROTTI: Sometimes. Not really."

In view of this record, we reject appellant's contention that she made reasonable efforts to change herself and her circumstances so that she can now give her daughter the care required for her well-being.

Appellant's contention that the judgment herein must be reversed because the trial court failed to make a finding as to what specific statutory grounds of unfitness enumerated in the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1501(D)) were found to exist, is without merit. She relies on *In re Rauch* (1977), 45 Ill. App. 3d 784, 359 N.E.2d 894, and *In re Westland* (1976), 48 Ill. App. 3d 172, 362 N.E.2d 1153. However, in neither case did the adoption petition contain an allegation that the parents were unfit nor any factual allegations in support thereof. The court in each case held that this amounted to a failure to perfect a cause of action for termination of parental rights. In the instant case the petition specifically alleges the mother's unfitness and the factors upon which the allegation of unfitness is based. As this court stated in *In re Adoption of Burton* (1976), 43 Ill. App. 3d 294, 298, 356 N.E.2d 1279:

"Absent other errors, we could nevertheless affirm if the evidence in the record supported the judgment, whatever the allegations or the reasons given by the trial court for its decision."

(See also *Interest of Hrusosky* (1976), 39 Ill. App. 3d 954, 959, 351 N.E.2d 386 (see concurring opinion).) Accordingly, we hold that the general finding of unfitness of this nonconsenting mother is sufficient to sustain the

judgment herein, where the petition alleges her unfitness, the specific grounds therefor are set forth with particularity, and the evidence in the record clearly and convincingly supports the judgment.

Appellant complains that the trial court failed to enunciate what standard of proof was applied. Section 4—6 of the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 704—6) provides that the standard of proof and rules of evidence in the nature of civil proceedings are applicable to hearings to determine neglect. We recognize the inherent right which all parents have to the society and custody of their own children (*In re Gonzales* (1974), 25 Ill. App. 3d 136, 323 N.E.2d 42; *In re Grant* (1975), 29 Ill. App. 3d 731, 331 N.E.2d 219) and that a nonconsenting parent may be found unfit and a guardian with power to consent to adoption appointed only for compelling reasons fully supported by clear and convincing evidence. (*Gates*, 57 Ill. App. 3d 844, 851; *Ybarra*, 29 Ill. App. 3d 725, 729; *In re Nitz* (1979), 76 Ill. App. 3d 15, 394 N.E.2d 887; *In re Barber* (1977), 55 Ill. App. 3d 587, 371 N.E.2d 299.) Our review of this record and the court's remarks at the time of the ruling leaves no doubt that proper standards were followed in finding Sheila Berry unfit.

■ Appellant lastly complains that the trial court improperly considered the best interests of the child in conjunction with making his general finding of unfitness. Both the Juvenile Court Act (Ill. Rev. Stat. 1977, ch. 37, par. 705—9(2)) and the Adoption Act (Ill. Rev. Stat. 1977, ch. 40, par. 1525) require that the best interests and welfare of the child be considered in a hearing as to parental fitness. (*Gates*, 57 Ill. App. 3d 844, 851; *Grant*, 29 Ill. App. 3d 731, 736.) In *Grant*, the court said:

> "It need hardly be added that, in reaching a decision in the type of case before us, the trial court and reviewing courts must give prime consideration to the welfare and best interests of the child or children involved. * * * In the type of situation before us, involving the issue of terminating the interests and rights of a natural parent so that the court may in the future proceed with examination of the merits of an adoption, we are required to consider the best interests of the minor. This is not only in accordance with the ancient and traditional theory that minors are wards of the court, it is required by specific language of the statute. By the Juvenile Court Act, as well as by the adoption statute, we are required to consider the best interests of the child. Ill. Rev. Stat. 1973, ch. 37, par. 701—2(3)(c); also ch. 4, par. 9.1—20a." (29 Ill. App. 3d 731, 736.)

(See also *In re Stilley* (1977), 66 Ill. 2d 515, 519-20, 363 N.E.2d 820, 823.) In the case of *In re Massey* (35 Ill. App. 3d 518, 521), the court said:

> "The rule is firmly established that in a proceeding for the custody of a child, the best interests of the child is the predominate

issue but that in a proceeding such as this where the rights and interests of a parent are sought to be permanently severed, the best interests of the child can be considered only if the court finds by clear and convincing evidence that the parent is unfit or consents to the severance (*In re Petition to Adopt Shuman*, 22 Ill. App. 3d 151, 319 N.E.2d 287; *In re Petition to Adopt Cech*, 8 Ill. App. 3d 642, 291 N.E.2d 21; *In re Deerwester*, 131 Ill. App. 2d 952, 267 N.E.2d 505). The judge found both parents to be unfit. The fact that he pronounced in open court his findings of the child's best interests prior to pronouncing his findings as to unfitness did not violate the rule or constitute error." We find this language equally applicable to the case at bar, and find no error. For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

JONES, P. J., and KARNS, J., concur.